UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEVEN NOWICKI,

                Petitioner,

   -v-

RAYMOND CUNNINGHAM,
Superintendent, Woodbourne Correctional Facility,

                Respondent.

---

Case No. 09-CV-8476 (KMK) (GAY)

ORDER ADOPTING
REPORT & RECOMMENDATION

KENNETH M. KARAS, District Judge:

       Petitioner Steven Nowicki ("Petitioner") was convicted in Westchester County Court in

the State of New York, following a jury trial, of four counts of sodomy in the first degree,

sixteen counts of sexual abuse in the first degree, and two counts of endangering the welfare of a

child. (*See* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1) ¶ 4.) Petitioner received a

determinate sentence of sixteen years of incarceration, followed by five years of post-release

supervision. (*See id.* ¶ 5.) The Appellate Division of the Second Department unanimously

affirmed the conviction and sentence on direct appeal, *see People v. Nowicki*, 852 N.Y.S.2d 783

(App. Div. 2008), and the Court of Appeals subsequently denied leave to appeal that decision,

*see People v. Nowicki*, 893 N.E.2d 452 (N.Y. 2008).

       Through counsel, Petitioner filed a Petition for habeas corpus in this Court. The matter

was referred to Magistrate Judge Yanthis, (*see* Order of Referral (Dkt. No. 2), who, in a Report

and Recommendation ("R&R"), recommended denying the Petition in full, (*see* Report and

Recommendation ("R&R") 1 (Dkt. No. 15)). For the reasons stated below, the Court adopts the

R&R's conclusion that the Petition should be denied.

## I. Background

### A. Factual Background

Petitioner's convictions arise from events that took place on the night of December 31, 1998, through the morning of January 1, 1999. (Resp't's Mem. of Law ("Resp't's Mem.") 4–8 (Dkt. No. 7).) At the time, Petitioner was a fifth-grade teacher at Dobbs Ferry Middle School and had established a relationship with Peter and Nancy Losee, the parents of "C.L.,"[1] one of Petitioner's students. (*See id.* at 3.) On the night of December 31, Petitioner attended, at the Losees' invitation, a New Year's Eve party at the Losees' house. (*See id.* at 4.) Petitioner arrived at the party around 5:00 p.m., and he was one of approximately twenty-to-thirty adults and fifteen children who attended the party throughout the night. (*See id.*) Moreover, from 5:00 p.m. until around midnight, Petitioner "consumed between six and ten alcoholic beverages." (Pet'r's Obj's to R&R ("Pet'r's Obj's") 10 (Dkt. No. 20).)

After midnight, Petitioner left the party and entered his vehicle, which was parked outside the Losees' home. (*See* Resp't's Mem. at 4–5.) A short time later, Peter Losee went outside and found Petitioner asleep or passed out in his car with the engine running. (*See id.* at 5.) Assuming that Petitioner was intoxicated, Peter invited Petitioner into his home and left him to sleep on the downstairs couch. (*See id.*)

Around 5:00 a.m., Petitioner entered the upstairs bedroom of C.L., his student, and G.L., C.L.'s younger brother, both of whom were sleeping in a bunk bed. (*See id.* at 3, 5.) Petitioner then proceeded to sodomize and sexually assault the boys. First, he molested G.L., who was

---

[1] The Court, like Magistrate Judge Yanthis but unlike Petitioner and Respondent, will follow Federal Rule of Civil Procedure 5.2's redaction requirement for the names of minors referenced in a court filing. *See* Fed. R. Civ. P. 5.2(a).

asleep in the bottom bunk, by "rubb[ing] and lick[ing] the side of the child's buttock, and put[ting] his mouth on [G.L.]'s penis and fondl[ing] and lick[ing] it." (*Id.* at 6.) Then, he molested C.L., who was asleep in the top bunk, by "put[ting] his mouth on [C.L.]'s penis and lick[ing] and suck[ing] it, rubb[ing] and touch[ing] [C.L.]'s penis and buttocks with his hand, . . . lick[ing] his chest over his pajama top[,] . . . lick[ing] [C.L.]'s buttocks and insert[ing] his finger into the child's rectum as he had his mouth on the boy's penis." (*Id.*)

Petitioner then left the room, entered the bathroom a few doors down the hall from the boys' bedroom, and subsequently returned to the bedroom and fell asleep on the floor. (*See id.* at 7–8.) C.L. then left the room to find his parents, whom he immediately told about the abuse. (*See id.*) Realizing that G.L. was still in his room, Peter returned to the bedroom, where he found Petitioner lying on the floor. (*See id.* at 7–8.) Peter then woke Petitioner, confronted him with C.L.'s allegations, and asked him to leave the house. (*See id.* at 8.)

In the meantime, Nancy Losee called Detective Sean White, a family friend, on his personal phone, while Peter called police headquarters. (*See id.* at 8–9.) The police arrived at the Losees' home around 5:35 a.m. (*See id.* at 9.) Subsequently, Peter, Nancy, C.L., and G.L. gave separate interviews to Detective White and Lieutenant Betsy Gelardi. (*See id.*) Later that morning, the victims were examined at St. Joseph's Hospital and sexual-assault kits were prepared. (*See id.*) Among the physical evidence collected was a swab from C.L.'s genital area. (*See id.* at 14.)

Separately, at approximately 7:00 a.m., Detective White and Officer Sullivan arrived at Petitioner's residence, wherein Petitioner voluntarily agreed to be interviewed at police headquarters. (*See id.* at 10.) After arriving at the station, Detective White advised Petitioner of his *Miranda* rights, Petitioner said he understood them, and he signed a waiver form. (*See id.*)

3

Detective White then interviewed Petitioner until 8:40 a.m, when Detective Joseph Ellman arrived at headquarters. (*See id.* at 11.) Stepping in for Detective White, Detective Ellman then re-advised Petitioner of his *Miranda* rights, and Petitioner again acknowledged that he understood those rights and that he agreed to continue the interview. (*See id.*) After approximately one hour, Detectives Ellman and White brought Petitioner to the Westchester County Department of Public Safety, and then back to police headquarters, where Petitioner consented to having his hands swabbed and his fingernails scraped, and where Detective Ellman resumed the interview. (*See id.* at 12.)

Around approximately 2:40 p.m., Petitioner received a third *Miranda* warning, and again he agreed to waive his rights by signing another waiver card. (*See id.*) Petitioner then dictated a statement to Detective Ellman, in which Petitioner admitted that "[i]t is absolutely possible that I touched [C.L.] and/or [G.L.] in an inappropriate way, by this I am referring to touching them in their genital area." (*Id.* at 12–13.) Detective Ellman, who had typed Petitioner's statement on a computer, then read the statement back to Petitioner, who confirmed its accuracy. (*See id.*) Detective Ellman then left the room to retrieve a printed copy of the statement, and Detective White entered the room. (*See id.*) Minutes later, Petitioner spontaneously told Detective White, "I did this." (*See id.*) Detective Ellman then returned to the room. (*See id.*) After reviewing the printout of his statement, Petitioner confirmed that it was accurate and signed it. (*See id.*) At 3:20 p.m., approximately forty minutes after he began dictating his statement, Petitioner spontaneously told Detective Ellman, "I fucked up that kid's whole life . . . [b]y what I did to him." (*See id.* at 13–14.) At 3:25 p.m., Petitioner was placed under arrest. (*See id.* at 14.)

On April 8, 1999, while awaiting trial and pursuant to a court order, Petitioner submitted to the collection of blood and saliva samples. (*See* Trial Tr. ("Tr.") 1696–97.) Those samples

were then sent to the Westchester County Department of Labs and Research in a sealed and labeled evidence kit. (*See id.* at 2255, 2290–91.) In conducting tests on the samples, Elayne Schwartz, a forensic scientist, indicated that he never used Petitioner's saliva sample, contained in a tube secured with a yellow top, and left it "stored in a walk-in refrigerator." (*Id.* at 2293.)

Subsequently, on April 13, 1999, the Westchester County lab scientists sent to GeneLex Corporation, a DNA-analysis lab located in Seattle, Washington, a package containing Petitioner's blood sample, his saliva sample, and C.L.'s genital swab. (*See* Tr. 2308–09.) The genital swab, preserved on a Q-Tip, was placed in a glassine envelope, which was stapled and placed in a Ziploc bag. (*See id.* at 2310.) Petitioner's dried blood sample was placed in a small manila envelope, which envelope was also stapled and placed into a separate Ziploc bag. (*See id.* at 2310.) Due to a lack of testimonial or physical evidence, it remains unclear how the saliva sample was packaged. (*See* Pet. ¶ 169.) All three samples were placed into a styrofoam cooler containing an icepack, which cooler was then sent in a cardboard box to GeneLex via FedEx overnight delivery. (*See* Tr. 2311–12.) The GeneLex lab scientist who received the samples later testified that she did not observe "any kind of leakage" in any of the samples and that there was no indication of contamination or tampering. (*Id.* at 2447–48.) Eventually, an analysis of the genital swab and the blood sample generated a DNA profile indicating a high likelihood of the presence of Petitioner's DNA—specifically, that DNA contained in C.L.'s genital swab was 55.9 million times more likely to have come from Petitioner than any other random Caucasian male. (*See id.* at 2451, 2453, 2455.)

Petitioner was indicted on multiple counts of first-degree sodomy, first-degree sexual assault, and endangering the welfare of a child. (R&R 1.) His jury trial subsequently took place in September/October of 2000. (R&R 2.) The prosecution called, among other witnesses, both

5

victims, both of the victims' parents, multiple guests who attended the New Year's Eve party, Detectives Ellman and White, and the Westchester County and GeneLex lab technicians who handled and tested the DNA samples. Petitioner testified as the sole witness in his defense. On October 8, 2000, on the fourth day of deliberations, the jury unanimously convicted Petitioner on all counts. (*See* Pet. ¶ 72; Tr. 3526–32.)

    B.  Procedural Background

    Petitioner was sentenced on January 24, 2001. (Pet. ¶ 28.) On February 14, 2001, he timely filed a Notice of Appeal to the Appellate Division, (*see* App. Submitted in Conjunction with 28 U.S.C. 2254 Appl. ("App.") at A-1 (Notice of Appeal)), which, on December 10, 2001, granted Petitioner's motion to proceed in forma pauperis, assigned counsel to pursue the appeal, and ordered the clerk of the trial court to provide certified trial transcripts to appellate counsel, (*see id.* at A-2–3).

    On January 29, 2002, while Petitioner was waiting to receive the trial transcripts, he filed the first of two state collateral attacks pursuant to New York Criminal Procedure Law § 440.10. (*See* Pet. ¶ 31.) In his first attack, Petitioner moved to vacate the judgment due to alleged prosecutorial misconduct, destruction of DNA evidence, and various instances of ineffective assistance of counsel. (*See* App. at A-4 (Aff. in Supp. of Mot. To Vacate J.).) On December 2, 2002, the trial court denied the Motion "in all respects," without a hearing, because "the defendant ha[d] not shown any provable non-record facts which would entitle him to any relief pursuant to CPL Article 440." (*Id.* at A-235 (Decision & Order on CPL 440 Mot.).) With regard to Petitioner's ineffective-assistance-of-counsel claim, the trial court specifically found that "the defendant most certainly had meaningful representation" and that "the trial attorney's

6

performance was not deficient." (*Id.* at A-234.) The Appellate Division denied leave to appeal

that decision on March 27, 2003. (*See id.* at A-324 (Decision & Order on Appl.).)

After reviewing the trial transcripts in July 2003, Petitioner claims to have discovered

that, "contrary to the trial court's [first] CPL § 440.10 decision, trial counsel [had] not attack[ed]

the DNA results," and the related "lab reports" were not matters of record. (Pet. ¶ 32.)

Petitioner then filed a second state collateral attack on March 23, 2005, arguing that his trial

counsel was ineffective under the New York and United States Constitutions "for failing to

utilize DNA laboratory reports or a defense DNA expert witness to attack the scientific findings

and credibility of the People's DNA expert witnesses." (App. at A-325 (Notice of Mot. To

Vacate J. of Conviction Pursuant to CPL 440.10.) In a Decision and Order dated November 28,

2005, a Westchester County Court Judge denied the Motion "in its entirety" on procedural

grounds, holding that Petitioner's claims "have either been previously considered and found to

be without merit or could have been raised in the earlier motion seeking the same relief,"

referring specifically to the first § 440.10 Motion. (A-515 (Decision and Order).) The Appellate

Division denied leave to appeal that decision.[2]

Petitioner ultimately filed a direct appeal on June 1, 2007, (*see id.* ¶ 33), arguing that he

was denied his right to effective assistance of counsel under the New York and United States

Constitutions, (*see* App. at A-557 (Br. for Def.–Appellant)). Specifically, Petitioner argued,

---

[2] The Court notes that both Parties agree that leave to appeal was denied. (*See* Pet. ¶ 32; Resp't's Mem. at 46.) However, at page A-551 of Petitioner's Appendix—to which Respondent cites—where Petitioner had apparently intended to include the "Second Department's Decision and Order" denying leave to appeal, instead there is a blank page with the handwritten notation "Insert Denial of Leave To Appeal 2nd 440 Here." (*See* App. at A-551.) For the purposes of resolving this Petition, the Court will assume that the Second Department did, in fact, deny leave to appeal the second § 440.10 Motion.

inter alia, that trial counsel failed to object to an intoxication instruction, (*see id.* at A-612–14), failed to object to the use of Petitioner's post-*Miranda* silence at trial (*see id.* at A-607–10), failed to object to inadmissible lay-opinion testimony, (*see id.* at A-610–12), failed to object to inadmissible hearsay and bolstering testimony, (*see id.* at A-592–600), and failed to raise a cross-contamination issue with the DNA samples, (*see id.* at A-600–05). Notably, Petitioner did not raise on direct appeal the specific ineffective-assistance claim raised in the second § 440.10 Motion—namely, that trial counsel "fail[ed] to utilize DNA laboratory reports or a defense DNA expert witness to attack the scientific findings and credibility of the People's DNA expert witnesses." (*Id.* at A-325 (Second § 440.10 Motion).)[3]

The Second Department denied the appeal on the merits on March 11, 2008, holding that "[t]he record demonstrates that defense counsel effectively cross-examined the People's witnesses, delivered a cogent opening and closing statement, and presented a plausible defense." *People v. Nowicki*, 852 N.Y.S.2d 783, 783 (App. Div. 2008). Furthermore, it held, "[t]he specific errors of defense counsel raised by the defendant either reflect the defendant's disagreement with reasonable trial tactics and strategies, or are not so serious as to deprive the defendant of a fair trial." *Id.* The Court of Appeals denied leave to appeal that decision on July 8, 2008, *see People v. Nowicki*, 893 N.E.2d 452 (N.Y. 2008).

---

[3] The Court notes that, in its securely bound and visibly undamaged copy of Petitioner's Appendix, pages A-583–91, representing pages twenty seven through thirty five of Petitioner's Direct Appeal Brief, appear to be missing. According to the Brief's Table of Contents, these pages contained part of the factual-background section, the standard-of-review section, and the beginning of the ineffective-assistance section. (*See* App. at A-553–54.) Because the Table of Contents does not otherwise indicate the inclusion of the specific claim made in the second § 440.10 Motion, and because Petitioner appears to concede that this claim was made only in his collateral attack, (*see* Pet. ¶ 27), the Court will assume that the claim was not made on direct appeal.

Petitioner filed the instant Petition on October 6, 2009, (*see* Pet.), followed by Respondent's Memorandum on January 10, 2010, as amended on February 5, 2010, (*see* Resp't's Mem.), and Petitioner's Traverse on March 11, 2010, (*see* Traverse in Supp. of Steven Nowicki's Pet. for a Writ of Habeas Corpus (Dkt. No. 11)).  Magistrate Judge Yanthis issued an R&R on March 30, 2011, recommending that the Petition be denied in full.  (*See* R&R.)  Thereafter, Petitioner submitted objections to the R&R on June 22, 2011, (*see* Pet'r's Obj's), to which Respondent filed a Response on August 1, 2011, (*see* Resp. to Pet'r's Obj's to R&R (Dkt. No. 23)), followed by Petitioner's Reply on August 22, 2011, (*see* Pet'r's Reply (Dkt. No. 25)).[4]

## II.  Discussion

### A.  Legal Standard

#### 1.  Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)–(F), *see* Fed. R. Civ. P. 6(d), for a total of seventeen days, *see* Fed. R. Civ. P. 6(a)(2).

---

[4] The Court notes that Petitioner's Objections were timely filed pursuant to two deadline extensions the Court granted at Petitioner's request.  (*See* Dkt. Nos. 18–19.)

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The district court "may adopt those portions of the . . . report [and recommendation] to which 'no specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 72(b)(2)).

### 2. Habeas Corpus

A petition for habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that a habeas petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1). In this context, "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). "[A]n unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether the determination was unreasonable—a substantially higher threshold."); *Jackson v. Conway*, — F.3d —, 2014 WL 3953234, at *13 (2d Cir. Aug. 14, 2014) ("[A] state court's 'unreasonable' application of law is not synonymous with an 'incorrect' or 'erroneous' decision. Thus, a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Instead, the state court's application must be objectively unreasonable, which . . . requires some increment of incorrectness beyond error." (citations and some internal quotation marks omitted)). Instead, "[§] 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks omitted). Consequently, a federal court must deny a habeas petition in some circumstances even if the court would have reached a conclusion different from the state court's, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*; *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1411 (2011) ("Even if the [federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the California Supreme Court to conclude that [petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman*, 695 F.3d 192, 197 (2d Cir. 2012) ("Although we might not have decided the issue in the way that the [New York State] Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach*—we . . . . must defer to the determination made by the state court . . . ." (emphasis added) (citation omitted)).

### 3.  Ineffective Assistance of Counsel

Petitioner's sole claim for habeas relief is that he was denied the effective assistance of counsel guaranteed to him by the Sixth Amendment, as incorporated against the states through the Fourteenth Amendment. (*See* Pet. ¶ 96.) The Court thus analyzes Petitioner's specific claims of ineffective assistance under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Chaidez v. United States*, 133 S. Ct. 1103, 1107–08 (2013) (noting that

11

*Strickland* "provides sufficient guidance for resolving virtually all claims of ineffective assistance, even though their particular circumstances will differ" (internal quotation marks omitted)). In *Strickland*, the Supreme Court held that a defendant claiming ineffective assistance of counsel must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694.

Under the first prong, the Court "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington*, 131 S. Ct. at 787 (internal quotation marks omitted). "To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen*, 131 S. Ct. at 1403 (alteration in original) (quoting *Strickland*, 466 U.S. at 688). "In applying and defining this standard substantial deference must be accorded to counsel's judgment." *Premo v. Moore*, 131 S. Ct. 733, 742 (2011); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

Under the second prong, because "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial," Petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. In this analysis, the Court "asks whether it is reasonably likely the result would have been different." *Harrington*, 131 S. Ct. at 792 (internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." *Id.* However, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective," because "[t]o set aside a conviction . . . solely because the

12

outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369–70 (1993) (footnote omitted).

Where, as here, a petitioner seeks habeas review of an ineffective-assistance-of-counsel claim under the test announced in *Strickland*, review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Harrington*, 131 S. Ct. at 788 ("The standards created by *Strickland* and [AEDPA] are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks and citations omitted)). Petitioner "must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 698–99. Thus, "[w]hen [AEDPA] applies, the question is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788; *see also Gueits v. Kirkpatrick*, 612 F.3d 118, 125 (2d Cir. 2010) ("[O]ur review is not focused on the proper application of New York law. Our task is limited to assessing whether the Appellate Division unreasonably applied *Strickland* . . . , even assuming that the state courts erroneously applied state law."); *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (when reviewing an ineffective-assistance claim in the context of a habeas petition, the court asks "only whether the [state court's] rejection of [the] claim amounted to an unreasonable application of the *Strickland* standard").[5]

---

[5] With respect to the ineffective-assistance claim raised in Petitioner's first § 440.10 Motion, the state court denied it under both federal and state law, applying *Strickland*'s two-part test and New York's "meaningful representation" test, respectively. (*See* App. at A-234 (citing *Strickland*, 466 U.S 668; *People v. Benevento*, 697 N.E.2d 584 (N.Y. 1998); *People v. Baldi*, 429 N.E.2d 400 (N.Y. 1981)).) When it denied Petitioner's ineffective-assistance claim on direct

### B. Analysis

The Petition presents six individual claims of ineffective assistance of counsel.

Respondent does not argue that the Petition was untimely filed or that it includes unexhausted

claims.[6] Instead, Respondent argues that one of the claims is procedurally barred, and that all of

the claims should be denied as meritless. The Court will address each argument in turn.

#### 1. Procedural Bar

In Part C of his Petition, Petitioner argues that trial counsel was ineffective for "fail[ing]

to raise an objection to the introduction of . . . flawed testimony" regarding DNA evidence that

Petitioner claims was likely contaminated during transportation to a third-party lab, (Pet.

¶¶ 178–79), and for failing to "object[] to [DNA] evidence and challenge[] its inaccuracies,

unreliability, and misleading nature" given indications that the evidence was actually

contaminated by a third party's DNA, (*id.* ¶¶ 181, 197, 204). Respondent argues that certain

aspects of the second claim (the "actual-contamination claim") are procedurally barred because,

when Petitioner raised this claim in his second § 440.10 Motion, the court denied it pursuant to

N.Y. Crim. Proc. Law § 440.10(3)(c), which Respondent argues is "an independent and adequate

---

appeal, however, the Appellate Division appeared to apply only state law to the claim. *See Nowicki*, 852 N.Y.S.2d 783, 783 (App. Div. 2008) (citing *Baldi*, 429 N.E.2d at 405). Nevertheless, because the Second Circuit has held that New York's "'meaningful representation' standard is not contrary to the *Strickland* standard," the Court analysis Petitioner's claims under AEDPA's "unreasonable application" prong. *Rosario v. Ercole*, 601 F.3d 118, 124 (2d Cir. 2010); *see also Matthews v. Raymond*, 562 F. App'x 43, 44 n.1 (2d Cir. 2014) (recognizing *Rosario* as binding case law "holding that the meaningful representation test, properly applied under New York law, is not 'contrary to' *Strickland*"). Indeed, New York courts have recognized that the "meaningful representation" test is "more generous to defendants than *Strickland*[]." *Jefferson v. LaClair*, — F. Supp. 2d —, 2014 WL 887116, at *14 n.12 (E.D.N.Y. Mar. 6, 2014) (internal quotation marks omitted).

[6] The Court notes that the Petition was timely filed and that the Petition's claims were exhausted either on direct appeal or in Petitioner's two § 440.10 Motions.

14

State ground . . . that bars the assertion of [this] claim[]" in the Petition. (Resp't's Mem. 48.)

"[U]nder the independent and adequate state ground doctrine, a federal court sitting in habeas 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991))). "Independent and adequate state law grounds preventing federal review include violations of state procedural rules . . . ." *Id.* Thus, "where a conviction rests upon [a defendant's state law 'procedural default'], a federal habeas court normally cannot consider the defendant's federal constitutional claim." *Trevino v. Thaler*, 133 S. Ct. 1911, 1917 (2013); *see also Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) ("[A] state court procedural default will bar habeas review when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." (internal quotation marks omitted)).

In his first § 440.10 Motion, Petitioner argued that trial counsel was ineffective for failing to challenge the DNA evidence on the ground that it was actually contaminated by third-party female DNA. (*See* App. at A-60.) The state court denied that claim on the merits, (*see id.* at A-232, A-234 ("[T]he defendant has not mounted a cogent argument on the DNA issue. . . . [I]t . . . seems that the defendant is merely complaining about a defense strategy which was not successful . . . .")), and the Appellate Division denied leave to appeal, (*see id.* at A-324). In his second § 440.10 Motion, Petitioner made the same claim based on the same report indicating the presence of third-party female DNA, (*see id.* at A-340–41), but he also made a new argument that he claimed independently supported his ineffective-assistance claim based on a report indicating the presence of third-party DNA that was different from the aforementioned female

15

DNA, (*see id.* at A-339–40). The state court denied Petitioner's second § 440.10 Motion on procedural grounds, citing N.Y. Crim. Proc. Law §§ 440.10(3)(b)–(c), and holding that Petitioner's claims ha[d] either been previously considered and found to be without merit or could have been raised in the earlier motion seeking the same relief." (*Id.* at A-514–15.)[7]

Respondent is correct that this Court is procedurally barred from considering the claims presented in Petitioner's second § 440.10 Motion. First, the Second Circuit has squarely held that § 440.10(3)(c) operates as an adequate and independent state-law ground. *See Murden v. Artuz*, 497 F.3d 178, 193–94 (2d Cir. 2007) (holding that § 440.10(3)(c) is both adequate and independent, and thus that petitioner's claim was "procedurally barred from federal review"). Second, § 440.10(3)(b) also operates as a procedural bar, because in deciding that a claim "was previously determined on the merits upon a prior motion," N.Y. Crim. Proc. Law § 440.10(3)(b), a state court necessarily does not evaluate the claim on its merits. *See Warren v. Goord*, No. 06-CV-1423, 2013 WL 1310465, at *16 (E.D.N.Y. Mar. 28, 2013) (holding that Appellate Division's denial of § 440.10 motion under §§ 440.10(3)(b) and (c) "clearly relied on an independent state procedural ground adequate to support the judgment").

However, the Court is not procedurally barred from considering Petitioner's overall actual-contamination claim because he separately exhausted this claim in his first § 440.10 Motion. Indeed, Respondent concedes that the Court is not barred from considering the claim as it relates to the evidence of female-third-party contamination presented in the first § 440.10

---

[7] New York Criminal Procedure Law § 440.10(3)(b) provides, in relevant part, that a court "may deny a motion to vacate a judgment when . . . [t]he ground or issue raised upon the motion was previously determined on the merits upon a prior motion or proceeding," and § 440.10(3)(c) provides, in relevant part, that such a motion may be denied when, "[u]pon a previous [§ 440.10] motion . . . , the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."

Motion. (*See* Resp't's Mem. 47 (arguing that Petitioner's arguments are procedurally barred "with the exception of the arguments made in the petition as to purported contamination by female DNA").) In this context, because the Petition's overall claim that trial counsel was ineffective for failing to "object[] to [the] [DNA] evidence" and to "challenge[] its inaccuracies, unreliability, and misleading nature," (Pet. ¶ 204), is essentially the same claim that Petitioner presented in both of his § 440.10 Motions (even though Petition relied on slightly different arguments in each Motion), the Court's determination that it is procedurally barred from reviewing the second § 440.10 Motion has no practical impact on its decision.

### 2. Petitioner's Claims

The Petition presents six ineffective-assistance-of-counsel claims: (a) failing to challenge the admissibility and credibility of DNA evidence that was allegedly *actually* contaminated with a third party's DNA, (*see* Pet. ¶¶ 180–204); (b) failing to challenge the admissibility and credibility of DNA evidence that was allegedly *likely* cross-contaminated with Petitioner's DNA, (*see id.* ¶¶ 163–79); (c) failing to object to allegedly inadmissible lay-opinion testimony, (*see id.* ¶¶ 152–59); (d) failing to object to allegedly inadmissible and unduly prejudicial hearsay, (*see id.* ¶¶ 141–51); (e) failing to object to questions allegedly eliciting Petitioner's post-*Miranda* silence, (*see id.* ¶¶ 123–40); and (f) failing to object to an intoxication instruction, (*see id.* ¶¶ 103–21).

### a. Actual Contamination

The Court first addresses Petitioner's aforementioned actual-contamination claim, which is that trial counsel "could have, and should have, objected to [DNA] evidence and challenged its inaccuracies, unreliability, and misleading nature" based on evidence that the DNA was actually contaminated by a third party. (Pet. ¶ 204.) Specifically, Petitioner contends that the

prosecution's lab reports, which trial counsel had access to before trial, demonstrated that the DNA test indicating a highly probable match of Petitioner's DNA in a sample obtained from C.L.'s genital area was compromised by "the presence of DNA belonging to neither [Petitioner] nor [C.L.]"  (*Id.* ¶ 181.)[8]

Based on exhibits Petitioner annexed to his first § 440.10 Motion, Petitioner argues that the experts' lab reports demonstrate that "female DNA [could] not be excluded" from the sample and that the analysis was "either unreliable in the first place" or that it "represent[ed] an additional contributor's alleles."  (*Id.* ¶¶ 195–96; App. at A-121–22 (lab reports).)  And, although the presence of third-party DNA could have been consistent with the prosecution's argument that the unexplained presence of Petitioner's DNA in the sample by itself is consistent with his guilt, Petitioner points out that the prosecution's experts testified that they "could not identify any foreign alleles," (Tr. 2454), that they "didn't find any indications of another DNA type other than the profiles from [Petitioner] and [C.L.]," (*id.* at 2473), that they "found absolutely no indication of anybody who was a co-contributor," (*id.* at 2401), found that the mixture was "consistent with having . . . come from only two people," (*id.* at 2400), and that they "could not detect any other person's DNA," (*id.* at 2414).  Petitioner complains that "trial counsel never questioned" these conclusions and statements which were in apparent conflict with the report.  (Pet. ¶¶ 198–201.)

When presented with this claim in Petitioner's first § 440.10 Motion, the trial court denied the claim as meritless.  Specifically, the trial court found that Petitioner "chose to have his own DNA expert review the tests and findings of the prosecution's experts."  (App. at A-

---

[8] At trial, the DNA lab supervisor testified that it was "55.9 million times more likely" that Petitioner was a contributor than any other Caucasian person.  (Tr. 2404.)

230.) Moreover, it found that Petitioner "appeared to take an active role in his prosecution," and that "at no time did [the trial-court judge] observe any friction, discord, or rancor between [Petitioner] and his attorney." (*Id.* at A-231.) Furthermore, it found that Petitioner seemed to be "merely complaining about a defense strategy which was not successful—a strategy which he seems to have been well aware of during the proceedings." (*Id.* at A-232.) Petitioner has not challenged any of these factual findings, much less "rebutt[ed] the presumption [of their] correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Given these findings and a review of the record presented to the trial court, this Court cannot say that the trial court unreasonably applied *Strickland* in denying Petitioner's claim. First, in light of the trial court's finding that trial counsel hired a DNA expert, there is no indication that trial counsel's decision not to call the expert or to make an issue out of the purported anomalies was anything other than a strategic decision counsel made to focus his resources on what he determined to be more important issues. *See Herndon v. United States*, No. 10-CV-1997, 2013 WL 2405511, at *5 (D. Conn. May 31, 2013) (finding no ineffective assistance where "the absence of testimony by a[n] . . . expert for the defense resulted not from the failure to subpoena such an expert but rather from a strategic decision not to call the defense expert who was present and available to testify"); *Velazquez v. Poole*, 614 F. Supp. 2d 284, 342 (E.D.N.Y. 2007) (finding no ineffective assistance where trial counsel analyzed DNA evidence but ultimately "made a strategic choice not to consult an expert witness to challenge the prosecution's expert testimony because doing so would not have been the most productive use of his resources"). Indeed, trial counsel may have concluded that raising these challenges to the experts' testimony could backfire if it caused the jury to focus more on the experts' credibility and the strong scientific support underlying the test results. *Cf. Harrington*, 131 S. Ct. at 790

19

("[M]aking a central issue out of blood evidence would have increased the likelihood of the prosecution's producing its own evidence on the [physical evidence's] origins and composition; and once matters proceeded on this course, there was a serious risk that expert evidence could destroy [the defendant's] case.").

Second, ignoring the potential contamination issue may have been consistent with trial counsel's strategy not to challenge the presence of Petitioner's DNA in the sample, but instead to make clear that none of the DNA tests could independently prove Petitioner's guilt. Indeed, multiple times during cross-examination, trial counsel advanced the argument that none of the experts' tests could prove that Petitioner's DNA was present because he in fact committed the crimes. (*See* Tr. 2411 ("Q. Does anything you do tell us where the saliva comes from?"); *id.* at 2412 ("Q. As you sit here today you have no knowledge of how saliva would have gotten on that genital area?"); *id.* at 2413 ("Q. It doesn't mean that your test tells you that [Petitioner] was the one who put [the DNA] there on the genital area?"); *id.* at 2421 ("Q. And as you sit here today, you don't have any clue, of your own knowledge, how the DNA got on [C.L.] that you examined?"); *id.* at 2464–65 ("Q. So hypothetically, if you had a situation where a person places their mouth on the penile area and leaves some DNA secretions, is that result going to be the same as if that same . . . person takes saliva from a container and places the saliva on that area; would that have the same result as far as you're concerned?"); *id.* at 2465 ("Q. So it would have the same result whether the [DNA] came from the mouth of the person or whether it was placed there by some other method?"). The trial court could have reasonably concluded that trial counsel was not deficient given that he "elicited confessions from the State's experts and was able to draw attention to weaknesses in their conclusions." *Harrington*, 131 S. Ct. at 791.

20

Third, Petitioner's argument is factually incorrect, because trial counsel did, in fact, cross

examine one of the experts on the presence of third-party DNA material:

> Q. And you said that your lab screened and found that the only alleles that you could find were attributable to [C.L.] or [Petitioner]?
>
> A. Those were the samples that we tested.
>
> Q. Did Elaine Schwartz ever tell you that there were stray alleles in the mix?
>
> A. No. In our DNA test —
>
> Q. Not in yours. When she talked to you about the substances she was sending you, did she ever tell you that there [were] stray alleles in the mix?
>
> A. No, the only ones that I'm familiar with are the ones from our laboratory.
>
> Q. As you look at the results of your laboratory and the tests you did, is there anything about those tests that would tell you how the saliva got on the penile/scrotum swab?
>
> A. No.
>
> Q. Thank you, ma'am.

(Tr. 2469–70.) Based on the transcript, it would be reasonable to conclude that trial counsel

attempted to question the validity of the lab report based on the presence of stray alleles, realized

that he was confusing the expert—and thus, possibly, the jury—and then, immediately before

ending his cross examination, decided to conclude with a question reminding the jury of his best

argument against the expert's testimony. In this context, the trial court reasonably could have

concluded that trial counsel was not deficient. *Cf. Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)

("When counsel focuses on some issues to the exclusion of others, there is a strong presumption

that he did so for tactical reasons rather than through sheer neglect.").

Fourth, Petitioner cannot overcome the presumption that trial counsel acted reasonably in

strategically focusing on certain lines of attack to the exclusion of others. "Even if some of [trial

21

counsel's] arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them," because "[f]ocusing on a small number of key points may be more persuasive than a shotgun approach." *Id.*; *see also Harrington*, 131 S. Ct. at 790 (noting that trial counsel acted reasonably to avoid "the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether [a witness] was telling the truth, or transform the case into a battle of experts").

Petitioner does not dispute the trial court's factual findings. And although he claims that trial counsel "could have, and should have," challenged the DNA evidence at trial, (Pet. ¶ 204), he has not come close to demonstrating that "*Strickland* required his attorney to act upon [his] knowledge" of the alleged flaws in the DNA report. *Harrington*, 131 S. Ct. at 791. At best, Petitioner's argument is that trial counsel did not explore a potentially fruitful line of questioning. But this is not enough to show that he was so deficient as to deny Petitioner his Sixth Amendment right to counsel. And, under AEDPA, this is certainly not enough to show "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.

### b. Likely Contamination

In addition to Petitioner's allegation that the DNA sample was contaminated with a third party's DNA, Petitioner makes the similar but distinct allegation that the DNA sample was likely cross-contaminated with Petitioner's own DNA, and that trial counsel was ineffective for failing to object to the admission of the evidence or to present the possibility of cross-contamination to the jury. Unlike the previous claim, which was based on evidence that arguably demonstrated actual contamination, Petitioner bases this claim on a lack of evidence demonstrating that the

22

sample was *not* contaminated.  Specifically, Petitioner argues that, when the Westchester County Department of Labs and Research sent the package to GeneLex containing C.L.'s genital swab and Petitioner's blood and saliva samples, it *might have* packaged the samples such that DNA from Petitioner's saliva sample contaminated the sample from C.L.

Petitioner has no evidence that cross-contamination actually occurred.  Instead, he argues that "no evidence—testimonial, photographic or otherwise—was elicited as to how the saliva sample had been packaged," (Pet. ¶ 170), that "no questions were asked concerning any steps that may have been taken to safeguard the test tube of [Petitioner's] saliva, or to prevent it from contaminating the evidence swab," (*id.* ¶ 172), that "[t]here was no testimony as to how—or even whether—the test tube of saliva had been sealed," (*id.* ¶ 176), that "[t]here was no testimony as to which envelope or bag had contained the test tube," (*id.*), that "[t]here was no testimony of the proximity of the test tube to the paper envelope containing the evidence swab," (*id.*), and that "[t]here was no testimony as to whether the items had been touching," (*id.*).  As a result, Petitioner claims that trial counsel's failure to object despite these "critical flaws in the foundation for the physical evidence, in the chain of custody, and in the foundation for the expert testimony," (*id.* ¶ 174), "could not have been the result of any rational strategy," (*id.* ¶ 179), and thus that trial counsel failed to render effective assistance.

To the extent that Petitioner argues that trial counsel was ineffective for failing to challenge the admissibility of the evidence, Petitioner's claim fails because, as Magistrate Judge Yanthis noted, under New York law, "questions of contamination generally go to the weight rather than the admissibility of DNA evidence."  (R&R at 17 (citing *People v. Ortiz*, 914 N.Y.S.2d 281, 282 (App. Div. 2011).)  A reasonably competent attorney defending a client in the year 2000 would have been aware of this.  *See, e.g., People v. Wesley*, 589 N.Y.S.2d 197, 199

23

(App. Div. 1992) ("[A]ncillary issues regarding integrity of the particular forensic sample from which the DNA fingerprint was obtained and whether the laboratory followed the accepted procedures in carrying out the tests on the particular sample at issue speak to the weight the evidence is accorded and thus are not relevant to the initial determination of admissibility."), *aff'd*, 633 N.E.2d 451 (N.Y. 1994); *see also People v. Scott*, 940 N.Y.S.2d 411, 414 (App. Div. 2012) (concluding that, where "the circumstances provide[d] reasonable assurances of the identity and unchanged condition of the evidence," "any deficiencies in the chain of custody . . . affect[ed] only the weight of the evidence and not its admissibility" (internal quotation marks omitted)); *People v. Watkins*, 793 N.Y.S.2d 657, 658 (App. Div. 2005) (same).

In his Objections to the R&R, Petitioner says that he is "aware of at least two cases in New York where DNA evidence was excluded based upon the laboratory's failure to follow generally accepted scientific principles." (Pet'r's Obj's at 28–29.) However, those cases are distinguishable, because the courts in those cases found that the evidence was unreliable and therefore inadmissible, not because the evidence may have been contaminated, but because the laboratories failed to analyze the evidence in accordance with reliable scientific methods. *See People v. Keene*, 591 N.Y.S.2d 733, 740–41 (Sup. Ct. 1992) (concluding that DNA evidence was inadmissible because the laboratory "did not substantially perform scientifically accepted tests and techniques and did not achieve scientifically reliable results"); *People v. Castro*, 545 N.Y.S.2d 985, 999 (Sup. Ct. 1989) (concluding that the DNA evidence was "inadmissible, as a matter of law," because "[t]he testing laboratory failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty"). By contrast, in *People v. Wesley*, a decision that post-dates both *Keene* and *Castro* and that pre-dates Petitioner's trial, the New York Court of Appeals

24

distinguished between the question of admissibility presented in cases like *Keene* and *Castro*,

where the court must determine if reliable scientific methods were actually employed in the case

at hand, and the question of the weight to give admissible DNA evidence, which is an issue for

the jury to decide, and which includes "possible infirmities in the collection and analysis of

data." *People v. Wesley*, 633 N.E.2d 451, 458 (N.Y. 1994).[9] Trial counsel was therefore not

ineffective for failing to challenge the admissibility of the DNA evidence based on the

possibility of contamination, because the objection would have been overruled as meritless

notwithstanding the two cases Petitioner identifies in his Objections. Moreover, even if

Petitioner, with the benefit of hindsight, were correct about the applicability of *Castro* and

*Keene*, trial counsel was not ineffective for failing to object at the time given potentially

---

[9] In *Wesley*, the Court of Appeals recognized a three-phase analysis applicable to DNA-identification evidence. First, the court considers "the acceptance by the relevant scientific community of the reliability of DNA evidence." 633 N.E.2d at 454. Second, the court considers "admissibility of the specific evidence—i.e., the trial foundation—and elements such as how the sample was acquired, whether the chain of custody was preserved[,] and how the tests were made." *Id.* at 457. At that phase, "[t]he focus moves from the general reliability concerns of [phase one] to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial." *Id.* at 458. After satisfying the analyses of the first and second phases, "the evidence is admissible," at which point, in the third phase, "the jury is left to hear the testimony and consider the weight of the evidence—i.e., *possible infirmities in the collection and analysis of data.*" *Id.* (emphasis added).

The only issue presented to the *Wesley* court concerned the first phase, whereas, as the *Wesley* court recognized, the issue presented to the *Castro* court (and, by implication, the *Keene* court) concerned the second phase. *See id.* ("Defendant's reliance on *Castro* is misplaced. In that case, the court concluded that there is general scientific acceptance of the theory underlying DNA identification, and that DNA forensic identification techniques and experiments are generally accepted in the scientific community and can produce reliable results. As for the techniques utilized in that case, however, the court concluded that [the laboratory] failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty. In this case, the evidence . . . was that the procedures used by [the laboratory] met standards of scientific acceptance and reliability."). Here, the issue presented to this Court concerns the third phase, which neither *Castro* nor *Keene* addressed.

conflicting New York law on DNA-evidence admissibility. *See Brown v. Greene*, 577 F.3d 107, 112 (2d Cir. 2009) (declining to find counsel ineffective for "failing to detect" a "fine" "distinction" in case law).

To the extent that Petitioner argues that trial counsel was ineffective for failing to attack the weight of the admitted DNA evidence, Petitioner's claim still fails. First, the Court's reasons for rejecting Petitioner's actual-contamination claim apply equally here, as trial counsel may have decided not to raise the cross-contamination issue for strategic reasons, including focusing the jury's attention on what trial counsel believed were stronger arguments. *See Harrington*, 131 S. Ct. at 790 (denying an ineffective-assistance claim where trial counsel acted to avoid "the possibility that expert testimony could shift attention to esoteric matters of forensic science").

Second, Petitioner cannot demonstrate prejudice because, although he has identified a number of things the prosecution did *not* do to prove that the sample was *not* contaminated, Petitioner concedes that the experts did testify extensively about the reliability of the sample and the test procedures. (*See* Tr. 2389–92 (testimony of Dr. Riley describing GeneLex's general quality controls); *id.* at 2394 ("[A]ll of the standard procedures and protocols were followed for this case."); *id.* at 2396–98 (testimony of Dr. Riley that, after he conducted "a technical review of the entire case from beginning to end," including "the acceptance of the evidence" at the lab, he found the results to be "accurate" and "reliable"); *id.* at 2425 ("Q. . . . [I]f there had been any indication of package tampering, would that have been noted in the case file? A. Yes, it certainly would. . . . Not only is there no indication of tampering [in the case file], but that tampering would be easily detected given the basis of the reference samples where were blood samples and the penile swab which was basically not a blood sample."); *id.* at 2448 ("Q. Now, based on your examination of the submitted items of evidence, did you find any evidence of

26

gross contamination of these items?  A.  No, I did not.  Q.  Based on your examination of these items of evidence that were submitted for your DNA analysis, did you find any evidence of tampering with respect to any of the packaging regarding these items of evidence?  A.  No.  Q. And did you note that in your report, or in your notes?  A.  Yes, in my notes.").)  Thus, Petitioner cannot demonstrate prejudice because even if trial counsel had raised every one of Petitioner's questions at trial, and even if the experts had answered every one of those questions in the negative, the jury still could have found the tests to be reliable.  *See Bennett v. United States*, 663 F.3d 71, 88 (2d Cir. 2011) ("[I]n order to show prejudice of the magnitude needed to support a claim of ineffective assistance of counsel, [a petitioner] is required to show a reasonable probability that but for the failures to object, the jury would not have convicted him on some count on which it found him guilty.").

Third, as in the actual-contamination claim, Petitioner is also incorrect here, as a matter of fact, that trial counsel did not question the integrity of the sample.  He did this, first, in his cross-examination of the lab supervisor, Dr. Riley:

> Q.  Dr. Riley, [GeneLex] obviously employs . . . a lot of mechanisms to ensure the integrity of the evidence, is that correct?
>
> A.  That is true, we have qualitative controls and qualitative assurances as well.
>
> Q.  Does anything you do ensure the integrity of the evidence before it reaches you?
>
> A.  There are a number of things that we do that help to ensure the integrity of the evidence before it reaches us.
>
> Among other things, as part of our accreditation with the American Society of Crime Laboratory Directors, we are required to maintain a secure chain of custody.  That means that the evidence is documented when it reaches us and we document the quality of the packaging, such that we can come into court and we can say what the quality of the packaging was when we received it.

27

> If it is not, in fact, appropriately sealed, for example, that is one of the things that we note and we apply an appropriate seal.

(Tr. 2408.) And then he continued this line of questioning in his cross-examination of Dr. Schwenke, the lab technician who actually performed the tests:

> Q. Ms. Schwenke, you received some items for examination from Ms. Schwartz, correct?
>
> A. Correct.
>
> Q. And how did you get those items?
>
> A. There were in a Federal Express package on a cold gel pack on ice.
>
> . . . .
>
> Q. Ms. Schwenke, was that Federal Express box sealed?
>
> A. It was taped shut, there was no evidence of tampering.
>
> . . . .
>
> Q. Was there any type of integrity seal placed on the Federal Express package?
>
> A. The clear plastic tape that was used to close the package is a type of integrity seal.
>
> Q. Who put the tape there, do you know?
>
> A. I don't know.
>
> Q. That is integrity tape you can buy over here at CVS? . . . .
>
> A. Yes, it's clear packing tape.
>
> Q. The post office even sells it?
>
> A. Yes.
>
> Q. Do you have that package today?
>
> A. No, I do not.

(Tr. 2459–60.) Petitioner might be unhappy with the result of this questioning. Or he might be unhappy that trial counsel did not pursue this line of questioning further. However, "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles*, 556 U.S. at 127. And Petitioner's argument does not overcome the "strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 131 S. Ct. at 790 (internal quotation marks omitted); *see also Luciano*, 158 F.3d at 660 ("[T]he conduct of . . . cross-examination is entrusted to the judgment of the lawyer, and a[ ] . . . court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken.").

Finally, in citing to the trial court's independent questioning of one of the experts in front of the jury, Petitioner's argument actually refutes itself. In his argument that the trial court "expressed its concern with the possible cross-contamination of the evidence" and "went out of its way to voir dire the witness," in Petitioner's view "signal[ling] grounds for an objection" that trial counsel never raised, (Pet. ¶ 50), Petitioner quotes the following exchange between the trial judge and the witness which took place after trial counsel's cross-examination, on the record, and in front of the jury (*id*. ¶¶ 50–52):

> Q. Let's assume for the sake of argument here that your laboratory receives a package. That package was sent to you by someone else and that package contained samples of DNA from two people, as well as swabs from the victim or alleged victim, and that some of those test tubes leaked or were contaminated on the swab. How do you know yourself whether or not this happened?
>
> A. So how do I know that evidence was not transferred from, for example, the reference sample onto the penile swab?
>
> Q. Yes.
>
> A. So [Petitioner's] DNA could have come from his reference?

29

Q. Yes. How do you know that didn't happen?

A. First of all, when we receive these materials, it's critical that the packaging of these be secure and good, because if you take—if you were to take, for example, two swabs—

Q. But you weren't there to receive it, were you?

A. We did, in fact—

Q. No, you. Were you there?

A. Did I receive it myself, no. However, I did review the receiving and I have actually seen the photographs of the package.

Q. The question is you did not receive it?

A. No, I did not.

Q. Did you examine the package?

A. I examined the photographs of the package.

Q. Did you examine the package?

A. No.

Q. Did you examine the contents to see what exact shape they were in, personally?

A. The package, no.

Q. So you are assuming that all of this was intact and was in pristine condition?

A. I'm assuming that the photographs that we took—

Q. No. You're assuming that the actual items, I'm not talking about photographs, the actual items were intact and in pristine condition; is that right?

A. That is correct.

Q. That is an assumption?

A. Based on the photographs, yes, it is.

(Tr. 2422–24.)  In the context of this exchange, a reasonably competent attorney could have thought that the trial judge adequately presented these issues to the jury and cast sufficient doubt on the reliability of the test results.  Moreover, where "[t]he touchstone of an ineffective-assistance claim is the fairness of the adversary proceeding," this exchange demonstrates that even if trial counsel's performance was deficient, the trial judge ensured that the overall process "was [not] fundamentally unfair or unreliable." *Lockhart*, 506 U.S. at 369–70.

Thus, for multiple reasons, the Court denies Petitioner's claim that he was denied the effective assistance of counsel for trial counsel's failure to object to the admissibility of the DNA evidence and his failure adequately to challenge the reliability of the DNA evidence on cross-examination.

### c. Lay-Opinion Testimony

Petitioner next challenges trial counsel's failure to object to multiple testimonial exchanges that were in apparent conflict with a pre-trial ruling excluding testimony representing the party guests' "lay opinion" of Petitioner's behavior at the party.  (*See* Pet. ¶ 152.)  In one exchange, one party guest (Joyce Gifford) testified that she spoke to another party guest (Diane Riefenhauser) at the party regarding Petitioner's behavior and her intent to "speak[] with the Losees the next morning."  (Tr. 925, 929.)  In another exchange, Reifenhauser testified on direct examination to similar facts:

> Q. Did you have an opportunity to speak with Nancy or Peter Losee about your observations of the defendant that evening?
>
> A. I had opportunities.
>
> Q. Did you take those opportunities to speak with them?
>
> A. No, I didn't.

31

Q. Why is that?

A. I wanted to address this issue the following day so Peter and Nancy would have no distractions and be able to focus on what I was going to tell them.

. . . .

Q. Did there come a time . . . when you did speak with Peter Losee about these observations of the defendant's conduct?

A. Yes.

Q. And when was that?

A. The following day. I called Peter to thank him for having the party and inviting us and I told him that I had—

Q. Let me just stop you there. So you had a conversation with him the next morning?

A. Yes.

(Tr. 963, 965.) Finally, in a third exchange, the victims' father testified on direct examination

that he received a telephone call from Gifford the morning after the incident:

Q. Did you have occasion to receive a telephone call from Joyce Gifford that morning?

A. Yes, I did.

Q. Did you speak with her?

A. Briefly.

Q. Did you also have occasion to see her later that morning?

A. Yes.

Q. Did she come over to your house?

A. Yes.

32

> Q. Without telling us what Ms. Gifford said to you, what was the nature of her
> telephone call to you?
>
> A. She was expressing concerns about Steven's behavior the night before.

(Tr. 1063.)

Petitioner claims that this testimony expressed the witnesses' lay opinions about Petitioner's behavior, which allegedly contravened a pre-trial order precluding "testimony of what [the witnesses] may have called to say the following day." (Pet. ¶ 153.) Because an objection would have been sustained, Petitioner argues, trial counsel was ineffective because "[t]here was no strategic reason for counsel's failure to object, especially as the defense specifically requested this preclusion." (Pet. ¶ 158.)

Even if Petitioner could demonstrate that trial counsel was deficient—which, as will become clear, he cannot—Petitioner does not come close to demonstrating that the failure to object was prejudicial. First, as the transcript makes clear, the witnesses—at the prosecution's direction—limited their testimony solely to the fact that they had certain conversations, without revealing the specific content of those conversations. The witnesses thus never actually testified as to their "lay opinion" of Petitioner's behavior. Second, Petitioner cannot demonstrate *Strickland* prejudice from these individual exchanges in a trial where the prosecution presented eyewitness testimony from the victims, DNA evidence, and Petitioner's multiple confessions to the police. *See Strickland*, 466 U.S. at 695–96 ("[A] court . . . must consider the totality of the evidence before the judge or jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.").

Additionally, Petitioner cannot demonstrate deficient performance. In a pre-trial hearing, the trial judge confirmed that she was going to limit the testimony of the party guests "to just the cold hard facts rather than their opinions." (Tr. 761.) Specifically, the trial judge instructed the parties that "[t]here is to be no testimony [such as, ']I kept an eye on him because I was worried,['] no testimony that these people thought there was misconduct, because that is taking it out of the province of the jury." (Tr. 765.)

In response, trial counsel specifically requested that he be allowed to ask the party-guest witnesses whether they notified the Losees about Petitioner's behavior at the party:

> [TRIAL COUNSEL]. [T]hese party guests called the Losees apparently within the next day or two and said we were concerned about the behavior they saw at the party. I would like to question these people if they saw this behavior, did they bring it to anyone's attention at the party. . . . If during the course of the party they made their observations known to the parents of these children. If they are saying they thought this behavior was bizarre, I think it's a reasonable question to ask[, "]did you bring that to the attention of the parents that evening.["]

(Tr. 768–69.) Initially, the trial judge rejected this request. (Tr. 769–70 ("[T]he fact that they called the next day I'm not going to allow in, all right. They are going to testify as to what they saw.").) However, upon further consideration, and at trial counsel's request, the trial judge allowed this line of questioning:

> [TRIAL COUNSEL]. I want to ask [the party guests], when you made these observations, did you bring that to the attention of the parents?
>
> [JUDGE]. Then the prosecution can bring in on redirect well, I did the next day.
>
> [TRIAL COUNSEL]. You will allow that?
>
> [JUDGE]. Yes, that is fair.

(Tr. 771.) But the trial judge maintained that the prosecution could not question the witnesses about their personal feelings about Petitioner's behavior. (Tr. 772 ("I don't want their feelings.

Their feelings are irrelevant. . . . It's what actually happened and whether or not that constitutes a crime . . . .").)

As these exchanges make clear, trial counsel's performance was not deficient for at least two reasons. First, the exchanges Petitioner has identified were not objectionable under the pre-trial ruling because the witnesses limited their testimony to the fact that they had certain conversations and did not reveal their personal feelings or specific opinions as to the appropriateness of Petitioner's behavior at the party. Second, and more importantly, the exchanges reveal that the testimony Petitioner has identified was actually part of trial counsel's strategy to undermine the witnesses' testimony by asking, in effect, "if Petitioner's behavior was so inappropriate, why didn't you notify the parents right away?" Petitioner is therefore incorrect that "there was no strategic reason for counsel's failure to object." (Pet. ¶ 158.) Thus, in addition to finding a lack of prejudice, because trial counsel's strategy "falls within the wide range of reasonably professional assistance," the Court refuses now to find him deficient "in the harsh light of hindsight." *Bell*, 535 U.S. at 702.

### d.  Hearsay Testimony

Petitioner next identifies a number of testimonial exchanges allegedly containing prejudicial hearsay, some of which trial counsel elected not to challenge during the prosecution's direct examination, and some of which trial counsel himself elicited during cross-examination. In each exchange, either the prosecution or trial counsel elicited hearsay testimony from various witnesses concerning what the victims had said about the molestation. (*See* Tr. 1789, 1795 (prosecution's direct examination of C.L.); *id.* at 2155–56, 2163 (prosecution's direct examination of Nurse Scala); *id.* at 2032, 2040 (prosecution's direct examination of Dr. Chase); *id.* at 1134 (prosecution's direct examination of Peter Losee); *id.* at 2665 (prosecution's direct

35

examination of Detective White); *id.* at 1431 (trial counsel's cross-examination of Nancy Losee); *id.* at 2722–23, 2736–37 (trial counsel's cross-examination of Detective White).) In addition to these exchanges, according to Petitioner, trial counsel successfully "fought to introduce" transcripts of G.L.'s videotaped testimony presented to the grand jury, which testimony "contained details that were not part of [G.L.'s] trial testimony . . . [and] served to strengthen the case against [Petitioner]." (Pet. ¶ 150.)

Petitioner suggests that, in addition to not eliciting or introducing harmful testimony, trial counsel could have successfully objected to much of the hearsay testimony. As Petitioner notes, "[t]he trial court repeatedly expressed its concern with the inordinate amount of hearsay being admitted without objection." (Pet. ¶ 144.) In one exchange, the trial court even told trial counsel that it was "getting disturbed . . . because . . . you're bringing in the victims' stories through every single witness, and [making] no objection[s]." (Tr. 2127–28.) Petitioner argues that "[t]here is no reasonable strategy that explains counsel's failures here," and that trial counsel's assistance was thereby "grossly ineffective." (Pet. ¶ 151.)

Trial counsel did have a strategy, however, and his failure to object and his use of the grand-jury testimony was entirely consistent with it. As trial counsel himself said, in response to the trial judge's concern with the lack of objections to the hearsay testimony, "[t]here is a reason I'm allowing it and not objecting." (Tr. 2128.) Specifically, trial counsel explained that "[t]o some extent the stories are different. Every time someone testifies, their rendition is different and that is important." (*Id.* at 2133.) This was in harmony with his general strategy, throughout trial, to undermine the witnesses' credibility. (*See id.* at 1191 (revealing trial counsel's strategy to attack Petitioner's confessions by arguing that he "didn't make those statements," making it "a question of credibility of the witnesses"); *id.* at 1457 (demonstrating trial counsel's view that a

36

psychologist's notes from an interview with Peter Losee were an issue in the trial because "the fact that people change their story is" an issue).)

Indeed, Petitioner specifically objects to trial counsel's introduction of G.L.'s grand-jury testimony, but the record reveals that even this was part of trial counsel's strategy to undermine the witnesses' credibility by demonstrating to the jury multiple inconsistencies in the victims' stories as they evolved over time and changed in each re-telling. In support of an application to admit the videotape of G.L.'s grand-jury testimony, trial counsel argued that

> if you watch his videotape, he is constantly flip-flopping back and forth about the order of things, so much so that at the end of the videotape [the interviewer] says let's clear up something and get it straight, let's clear up what happened.
>
> . . . .
>
> If you would listen to the tape or if you would view the tape you would see it's very inconsistent with his trial testimony. In fact, there is a whole new spin on it now.

(*Id.* at 1541–42.) And although trial counsel ultimately used only the transcript at trial, instead of the videotape, he used it to cross-examine the victims and demonstrate inconsistencies in their testimony. (*See id.* at 1636 (referencing the grand-jury testimony in cross-examination of G.L. and pointing out, "now today you're telling the jury it's something else?"); *id.* at 1655 (using transcript to demonstrate inconsistency in G.L.'s identification of Petitioner); *id.* at 1832–33 (using transcript to contradict C.L.'s testimony that Petitioner's behavior at the party was "strange"); *id.* at 1872–73 (using transcript to demonstrate inconsistency in C.L.'s description of the perpetrator, who had hair that "stood out, like it was up," and Petitioner, who had "big and floppy" hair) .) Moreover, if this strategy was as prejudicial to Petitioner as he now claims, it is surprising that the prosecution vehemently opposed introduction of the grand-jury videotape and unsuccessfully objected to trial counsel's motion to admit the transcript into evidence. (*See id.* at

1543 (prosecution claiming, in opposition to trial counsel's application to admit the videotape, that it was "one of the most outrageous applications [she had] ever, ever heard"); *id.* at 1644, 1656 (prosecution twice objecting to admission of transcript).)

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 131 S. Ct. at 791 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 687). Here, trial counsel's use of the grand-jury-testimony transcript, and his decision not to object to testimony that was arguably objectionable on the grounds of hearsay and improper bolstering, meets this standard because it was reasonable for trial counsel to focus on the witnesses' credibility and the inconsistencies in their statements. *See id.* at 790 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."); *Figueroa v. Heath*, No. 10-CV-121, 2011 WL 1838781, at *16 (E.D.N.Y. May 13, 2011) (denying an ineffective-assistance claim for eliciting otherwise inadmissible testimony because it was consistent with a strategy that "dr[e]w attention to inconsistencies in [a prosecution witness's] testimony . . . , thereby further discrediting [that] testimony"). This is true even where trial counsel arguably allows multiple witnesses to bolster a single witness's testimony. *See Robinson v. Graham*, 671 F. Supp. 2d 338, 349 (N.D.N.Y. 2009) (where trial counsel's failure to object to bolstering testimony—which allegedly "turned a one-witness identification into a five-witness identification"—was consistent with an overall defense that petitioner did not challenge, "it hardly constitute[d] ineffective assistance of counsel . . . not to have interposed the objection").

Petitioner challenges trial counsel's strategy now, in the context of a conviction and prison sentence. But Petitioner cannot obtain relief based on the failure of the strategy, because

"[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation . . . ." *Harrington*, 131 S. Ct. at 791. Moreover, Petitioner argues that "no reasonable strategy explains counsel's failures here." (Pet. ¶ 151). However, "[w]ithout evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude, *Strickland*'s strong presumption must stand." *Greiner v. Wells*, 417 F.3d 305, 306 (2d Cir. 2005) (citation omitted).

Finally, even if trial counsel was deficient, Petitioner cannot demonstrate prejudice. Because even if trial counsel had objected to all of the hearsay and bolstering testimony, the prosecution still would have introduced the victims' identifications of Petitioner as the perpetrator. That, combined with Petitioner's multiple confessions and the DNA evidence, would have been more than enough to support the jury's verdict. *Cf. Parson v. Portuondo*, 259 F. Supp. 2d 309, 313 (S.D.N.Y. 2003) ("[E]ven if . . . admission into evidence [of alleged bolstering testimony] was improper, counsel's failure to object would not have altered the outcome of the trial because the victims had already testified and had unequivocally identified [the defendant] in court as the [perpetrator]. The jury could reasonably have relied on that identification alone as a basis for a finding of guilt.").

### e.  Post-*Miranda* Silence

Petitioner next objects to a number of questions the prosecution asked both in direct and redirect examinations during its case-in-chief and in cross-examination of Defendant when he took the stand in his own defense. All of these questions, according to Petitioner, impermissibly asked the jury to draw negative inferences from Petitioner's silence on certain subjects when he spoke to police after he had been given *Miranda* warnings and waived his *Miranda* rights. In

that context, Petitioner argues that trial counsel was ineffective for not objecting to these

questions or seeking curative instructions.

Petitioner identifies a number of questions that the prosecution asked Detectives Ellman

and White during direct and redirect examination. First, the prosecution asked whether

Petitioner ever told the police that C.L. and G.L. were mistaken:

> Q. Did [Petitioner] at any time indicate to you during your conversations with
> him that the Losee children could be mistaken about identifying him as the
> perpetrator of these crimes?
>
> . . . .
>
> A. No, [Petitioner] did not say that the children were mistaken . . . .
>
> . . . .
>
> Q. Did [Petitioner] ever tell you that the boys were mistaken?
>
> A. No.

(Tr. 2571, 2694 (direct examinations of Detective Ellman and White, respectively).) Second, the

prosecution asked whether Petitioner ever mentioned that he had any "problems or conflicts or

issues" with the Losees and whether they were "setting him up":

> Q. Either in connection with the taking of that statement of admission or at any
> other time during the day when you were speaking with the defendant, did he
> indicate to you anything about any problems or conflicts or issues that he had had
> earlier with the Losees?
>
> A. No, he did not.
>
> . . . .
>
> Q. And at any time during the conversations with the defendant, at any point on
> New Year's Day did he tell you that the Losee family was setting him up?
>
> A. No, he did not.

(*Id.* at 2571–72 (direct examination of Detective Ellman).)[10]  Third, on direct examination of

Detective Ellman, the prosecution asked whether, at a certain point, Petitioner "admit[ted] or

den[ied] the allegations," to which Detective Ellman responded, "[h]e did neither." (*Id.* at 2533.)

This was followed, on re-direct examination of Detective Ellman, with two questions asking

whether Petitioner denied the allegations:

> Q. At any time during your conversation with Steven Nowicki, at any point
> during January 1 of 1999, did he state to you ["]I never touched Christopher or
> Gregory Losee?["]
>
> A. He never said that.
>
> Q. When he did the statement, the signed statement, the statement of admission,
> did he ever tell you to put in there maybe these boys were touched, but it wasn't
> by me?
>
> A. No, he did not.

(*Id.* at 2643.)

Finally, a number of times during the direct and re-direct examination of Detectives

Ellman and White, the prosecution asked whether Petitioner ever mentioned during police

questioning that an intruder may have abused C.L. and G.L.:

> Q. At any point during your initial conversation with the defendant, what, if
> anything, did he tell you about an intruder being in the house that night or those
> early morning hours?
>
> A. He never mentioned anything to that effect.  Again, he explained to me the
> only people in the house were the two Losee boys, Christopher and Gregory, as
> well as Mr. and Mrs. Losee and Mr. Nowicki himself.

---

[10] Petitioner also cites a statement that may relate to this issue, although it is unclear from
the Petition or any of the subsequent memoranda exactly how the question was prejudicial.  (Pet.
¶ 125; *see also* Tr. 2531 ("Q. At any time did [Petitioner] indicate to you in this initial
conversation that he saw Peter or Nancy coming out of the boys' room?  A. No, he did not
indicate that at all.").)

Q. When you spoke with the defendant that morning and he told you that he went
into the boys' room after using the bathroom, what, if anything, did he tell you
about someone else being in the boys' room that morning?

A. He did not mention anybody else being in the boys' room, other than
Christopher and Gregroy Losee and himself, Mr. Nowicki,

(*id.* at 2531 (direct examination of Detective Ellman));

Q. In that statement, Detective, is there any mention by the defendant that there
was a possible intruder in the home of the Losee's on New Year's Day morning?

A. No, there is not.

Q. At any point when you were taking the statement from the defendant, did he
indicate to you that anyone else was in the house besides the Losee family and the
defendant himself?

A. No, he did not,

(*id.* at 2570–71 (direct examination of Detective Ellman));

Q. Did he ever say to you that at any point in the night he heard someone come
into the Losee home?

A. No, he did not.

Q. Did he ever indicate to you that there may possibly have been an intruder who
sexually abused these boys?

A. No, he did not,

(*id.* at 2643–44 (re-direct examination of Detective Ellman));

Q. At any time when you spoke with the defendant on the morning of January 1,
did he tell you that there was an intruder in the Losee home that morning or that
night?

A. No, that was never mentioned at all,

(*id.* at 2694 (direct examination of Detective White)).[11]

---

[11] Petitioner also cites two other questions, but the prejudicial nature of the questions is
not immediately apparent in the context of the record, and Petitioner does not identify how trial
counsel's failure to object to these questions or otherwise address them demonstrates prejudice

Petitioner next identifies a number of questions the prosecution asked him on cross-examination during the defense's case. First, the prosecution asked Petitioner whether, in his signed statement of admission, he had indicated how many drinks he had consumed:

> Q. In that statement you don't indicate how much you had to drink that night, correct?
>
> A. No, it does not indicate how much I had to drink.
>
> . . . .
>
> Q. In your signed statement where you indicated you had been drinking on the night of New Year's Eve, you do not indicate how much you had to drink, isn't that true?
>
> A. I would have to look at the statement again to refresh my memory. No, ma'am, it only says that I drank alcoholic beverages.

(*Id.* at 2946, 2977.) Second, the prosecution asked Petitioner whether he told police about his reaction when Peter first confronted him with the allegations:

> Q. "Isn't it true that you told police that you said, "Peter, that's fucked up"?
>
> A. At one point I did say that to him, yes.
>
> Q. So you didn't say anything to the police about when Peter confronted you that Peter was drunk, did you?
>
> A. No, I did not.
>
> Q. In fact, the first time you said anything about Peter Losee being drunk was today on your direct examination, right?

---

under *Strickland*'s second prong. (*See* Tr. 2531 (direct examination of Detective Ellman) ("Q. And do you remember [Petitioner] mentioning anything about another sibling, another sister? A. No, he didn't."); *id.* at 2694 (direct examination of Detective White) ("Q. What, if anything, did [Petitioner] ever tell you about [C.L.] having had a nightmare about this? A. He never mentioned anything about a nightmare to me.").) Moreover, to the extent Petitioner could argue that these questions, by themselves, are prejudicial, he has not demonstrated that the state court's contrary finding was unreasonable. Indeed, neither Party brought up either issue in summation, and the record does not otherwise reflect that the negative inferences the jury might draw from these questions affected Petitioner's defense in any way.

A. That is correct.

. . . .

Q. Now, in this statement [of admission], you indicate following a discussion of Peter's allegation, "he decided it would be best that I leave and I then drove myself home," correct?

A. Yes.

Q. And so there is nothing in here about "Peter, you're out of your fucking mind" or "you're still drunk," is there?

A. Not in that statement, no.

(*Id.* at 2964–67.) Third, the prosecution asked Petitioner whether he ever mentioned to the police that there might have been an intruder:

Q. You never mentioned to Officer Rinaldi that you believed there was an intruder in the Losee home that night, did you?

A. Officer Rinaldi and I, I don't believe we talked about the sexual allegations in this case . . . .

. . . .

Q. In fact, when you spoke with Detective White, you never said anything to him about the possible intruder in the Losees' home either, did you?

. . . .

A. No, I never did.

(*Id.* at 3085, 3090.) Fourth, the prosecution asked Petitioner whether he told police about any "problems" he had with the Losees:

Q. At no time when you spoke with Detective White or Detective Ellman, or any other police officer in conjunction with this case, did you tell them that you had had any problems with Nancy or Peter Losee, correct?

A. No, not at all.

(*Id.* at 2980–81.)

44

Finally, in two separate exchanges, the prosecution asked Petitioner a number of questions related to the spit bottle Petitioner claimed he had used in connection with his chewing-tobacco habit:

> Q. Let's talk about the first page of [the statement of admission]. Do you in any way in that document on the first page indicate to Detective Ellman that you had been chewing tobacco earlier in the evening?
>
> A. Not on this document, no.
>
> Q. And, in fact, did you tell Detective White that you were chewing tobacco throughout the course of the evening?
>
> A. No, I don't recall telling him that.
>
> Q. And did you tell Detective Hess that you had been chewing tobacco throughout the course of the evening?
>
> A. No, sir, I don't think I told Detective Hess, either.
>
> Q. Did you tell Detective Ellman in any of your conversations with him that you had been chewing tobacco throughout the course of the evening?
>
> A. No, I don't think so.
>
> Q. In fact, the only thing you ever said about chewing tobacco was that sometime after midnight, after all the guests had left, you went out to your car to chew tobacco, is that right?
>
> A. That is correct.
>
> Q. And that is what the statement reflects, is that correct?
>
> A. That is what the statement reflects, correct,

(*id.* at 2945–46);

> Q. When you spoke to Detective White on the morning of January 1 of last year, you never told him anything about the plastic soda bottle, right?
>
> A. No, I never did. It wasn't really that important to me.

45

Q. And when you spoke to Detective Ellman, you never told him anything about the soda bottle either, right?

A. No, I don't believe I did, it wasn't that important to me.

. . . .

Q. You didn't mention anything to Mr. Rinaldi about going out to your car after midnight to chew tobacco, right?

A. No, I didn't. I didn't think it mattered,

(*id.* at 3083–85).[12]

Petitioner contends that these questions "improperly created the impression that

[Petitioner] was evasive during his interrogation by not answering questions that had not, in fact,

been asked," and that they "improperly created the impression that [Petitioner] had offered no

innocent explanations because he was actually guilty." (Pet. ¶¶ 133–34.) Accordingly,

Petitioner argues that "[t]rial counsel had several grounds upon which to object to the" questions,

including that they "violated the principles announced in" the Supreme Court's decision in *Doyle*

*v. Ohio*, 426 U.S. 610 (1976). (*Id.* at ¶¶ 131, 135). In that case, the Supreme Court recognized

that "every post-arrest silence is insolubly ambiguous because of what the State is required to

---

[12] As with the case-in-chief questions, Petitioner identified other arguably problematic questions. (*See* Tr. 2958–59 ("Q. And even when Nancy and Peter spoke with you about encouraging [C.L.] not to be sad, you didn't know anything about what the source of his sadness was; was that your testimony? A. At that point [C.L.] told me that his sadness was a fear that his parents were going to be divorced and I didn't want to probe any further into it because it wasn't any of my business. Q. His sadness was a fear that his parents were going to be divorced. Did you ever mention that to the police? A. No, I don't believe it's any of their business either. Q. Did you think it was relevant to this case? A. Not at all."); *id.* at 2978 ("Q. Isn't it also true that at one point during this investigation you indicated that [C.L.] must have had a nightmare? A. I don't remember saying that. Q. You don't recall saying that [C.L.] must have had a nightmare that someone sexually abused him? A. I don't recall saying it, but if you say that I said it and you have something in a transcript and you show it to me, I might remember.").) With respect to these questions, it is also not clear how they were prejudicial in a *Strickland* sense, or how the state court decision denying Petitioner's ineffective-assistance claim was unreasonable.

advise the person arrested," and that the "assurance that silence will carry no penalty . . . is

implicit to any person who receives [*Miranda*] warnings." *Id.* at 618.  The Supreme Court

therefore held that "it would be fundamentally unfair and a deprivation of due process to allow

[an] arrested person's silence to be used to impeach an explanation subsequently offered at trial."

*Id.*  Here, where the prosecution's questions in its case-in-chief and in its cross-examination of

Petitioner arguably used Petitioner's silence as evidence of his guilt, Petitioner contends that trial

counsel could have successfully objected to the questions under *Doyle*.  His failure to do so,

Petitioner argues, "contributed to the guilty verdict."  (Pet. ¶ 139.)

     Even where an objection would have been sustained, an attorney is not required to raise

an objection in order to render effective assistance.  This is true for many reasons.  First, an

attorney might have reasonably thought the objection would have been meritless, meaning that

the attorney would not have rendered deficient performance.  *See Premo*, 131 S. Ct. at 741

(noting that "the relevant question under *Strickland*" is not whether the motion or objection

"would have succeeded," but instead whether "no competent attorney would think a [motion or

objection] would have failed").  In this context, an attorney would not be ineffective for "failing

to detect" a "fine" "distinction" in case law.  *Brown*, 577 F.3d at 112; *see also Songer v.

Wainwright*, 469 U.S. 1133, 1140 n.14 (1985) (noting that a trial attorney has "cause for failing

to object" where his "decision regarding the admissibility of . . . evidence was a 'reasonable'

one" under the law in effect at the time (internal quotation marks omitted)).  Second, an attorney

might have had a legitimate strategic or tactical reason for not raising an objection, which would

in fact demonstrate effective assistance.  *See United States v. Luciano*, 158 F.3d 655, 660 (2d

Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of

the lawyer, and an appellate court on a cold record should not second-guess such decisions

47

unless there is no strategic or tactical justification for the course taken."). In this context, an attorney might have elected not to object to a question because he did not want to draw attention to it, *see Morrison v. McCray*, No. 09-CV-126, 2012 WL 1085306, at *6 (W.D.N.Y. Mar. 21, 2011) (denying an ineffective-assistance claim where it was "possible that counsel made a reasonable strategic decision not to object to [a witness's] statement to avoid highlighting it to the jury"); *Charles v. Fischer*, 516 F. Supp. 2d 210, 217 (E.D.N.Y. 2007) (noting that "an attorney's failure to object generally is considered a strategic decision," and finding that it was "possible that trial counsel did not want to draw attention to the testimony"), or because he knew he could directly address the issue during his own questioning of a witness or during summation, *see Eze v. Senkowski*, 321 F.3d 110, 131 (2d Cir. 2003) ("It also is possible . . . that there was a strategic explanation for not objecting. The defense may have decided not to draw attention to this matter during direct examination, but instead attack the testimony on cross examination . . . ."); *Rogers v. Chappius*, No. 12-CV-148, 2013 WL 1825505, at *14 (W.D.N.Y. Apr. 30, 2013) (denying an ineffective-assistance claim based on a failure to object to the prosecution's cross-examination questions because trial counsel "effectively rehabilitated [the defendant] on re-direct, thereby eliminating any prejudice flowing therefrom"); *Neil v. Walsh*, No. 07-CV-6685, 2009 WL 382637, at *22 (S.D.N.Y. Feb. 17, 2009) ("The decision to withhold objections during direct testimony in order to attack a witness on cross-examination is a sound trial strategy which should not be second-guessed at this stage."). Third, a failure to make a meritorious objection does not constitute ineffective assistance where there the failure to object did not result in prejudice. *See Lockhart*, 506 U.S. at 366 (noting that "[b]ecause the result of the . . . proceeding . . . was rendered neither unreliable nor fundamentally unfair as a result of counsel's failure to make [an] objection," petitioner did not demonstrate prejudice under *Strickland*).

48

Moreover, in the context of a habeas petition, the question is not whether the failure to object constituted ineffective assistance, but whether the state court unreasonably concluded that it was not ineffective assistance. *See Harrington*, 131 S. Ct. at 786; *Samuel v. LeValley*, No. 12-CV-2372, 2013 WL 550688, at *12 (E.D.N.Y. Feb. 12, 2013) (denying an ineffective-assistance habeas claim where the state court "had a reasonable basis to conclude that even if defense counsel erred by failing to object [to the prosecution's use of the petitioner's post-*Miranda* silence], those errors were not so serious as to deprive [the] petitioner of a fair trial").

Here, even assuming that an objection to every question Petitioner identifies would have been sustained, Petitioner has not demonstrated that the state court unreasonably denied his ineffective-assistance claim. As a review of the record makes clear, even where trial counsel did not object to a question or did not seek a curative instruction, he directly addressed the substance of the question either in his questioning of a witness or in his summation. In this sense, his decision not to object or to seek a curative instruction, by itself, does not demonstrate deficient performance, and his subsequent efforts to cure the negative inferences demonstrate that Petitioner suffered no prejudice from the questions.

With regard to the intruder issue the prosecution raised in its case-in-chief (with direct-examination questions to Detectives Ellman and White) and in its cross-examination of Petitioner, trial counsel specifically cured any negative inference that the jury might have drawn from Petitioner's failure to mention it to the police. First, in his cross-examination of Detective Ellman, trial counsel made it clear that Petitioner did not mention an intruder to the police, not because he "was evasive during his interrogation" or because he "was actually guilty," (Pet. ¶¶ 133–34), but because the police did not ask him about an intruder:

Q. Did you ask [Petitioner] if there had been an intruder in the house that night?

A. No.  He explained to me there was nobody there but the Losees and himself.

. . . .

Q. Was there an intruder at the Losees' house?

A. There was no occasion, the Losees didn't indicate that and neither did [Petitioner].

Q. . . . . Was the point of your investigation to investigate an intruder at the Losee home?

A. No.

Q. Did you ask him any questions about an intruder at the Losee house?

A. No, I did not.

(Tr. 2632–33.)

Second, during his re-direct examination of Petitioner, trial counsel elicited a lengthy exchange that explained why Petitioner never mentioned an intruder to the police during the investigation:

Q. . . . . Let's talk about this intruder business.  [The prosecution] asked you if you ever told the police that there was an intruder in the Losee home.  Did you?

A. No, I never asked the police that.

THE COURT.  Asked the police that or said that to the police?

Q. Did you ever tell the police there was an intruder in the Losee home?

A. No, I never told the police there was an intruder in the home.

Q. As you think back to the New Year's Eve party that you were at, do you recall seeing an intruder in the Losee home?

A. No, I don't.

Q. I'll rephrase it. When is the first time that you became aware of the fact that there may have been a strange person in the Losee home that night?

A. When I started hearing testimony in this case regarding people with descriptions that were totally different from mine.

Q. And did you hear the description of a floppy headed man?

A. Yes.

Q. Did that come out of the mouth of one of the boys in the grand jury?

A. I believe it came out of [C.L.'s] or, yes, one of the boys at the grand jury testimony.

Q. Did you also . . . hear testimony from [C.L.] where he describes the person who did this to him as being a fuzzy headed man?

A. Yes, I also read that testimony.

Q. Did you also hear testimony at some point through the police from [G.L.] that a strange voice in the house said turn on the light?

A. Yes, I remember that testimony as well.

Q. So when you sat down with the police on New Year's Day of 1999, you didn't know anything about the boys' grand jury testimony, right?

A. No, it hadn't taken place.

Q. And you didn't know anything that [G.L.] had told one of the police officers, that a strange voice in the hallway said turn on the light?

A. I was given no information about that.

(*Id.* at 3104–06.)

Third, in his summation, trial counsel specifically reinforced the points he made in his re-direct examination when he told the jury that Petitioner did not mention an intruder to the police because the possibility of an intruder first became apparent during the trial:

> Somewhere along the line the idea of an intruder came into this case, and I submit
> to you that that intruder was not placed in this case by my client. It was placed in
> this case by [G.L.'s] testimony who said somewhere out in the hallway he hears a
> strange voice and they turn on the light.

(*Id.* at 3170.)[13] The record therefore demonstrates that trial counsel provided to the jury a cogent

and believable explanation for Petitioner's silence on the intruder issue in the face of police

questioning, thereby demonstrating that trial counsel's failure to object was consistent with a

sound trial strategy, and that the questions were not prejudicial because trial counsel cured the

negative inference.

With regard to the two questions the prosecution asked Detectives Ellman and White

eliciting whether Petitioner had told police that the boys "could be" or "were" "mistaken," (*id.* at

2571, 2694), trial counsel directly addressed this issue in his direct examination of Petitioner.

The prosecution asked these questions in the context of Petitioner's affirmative statement to the

police indicating that he did not believe C.L. or G.L. were liars. (*See id.* at 2572 ("A. No,

[Petitioner] did not say that the children were mistaken. In fact, he did mention that they would

not lie."); *id.* at 2693–94 ("Q. When you were speaking with [Petitioner] in your office that

morning, what, if anything, did he tell you regarding [C.L.] or [G.L.]'s motive to fabricate these

allegations against him? A. He said he couldn't understand that they would make something

like this up, he said they're good kids, they're not liars. He actually defended them. Q. Did he

ever tell you that the boys were mistaken? A. No.").) In his direct examination of Petitioner,

trial counsel allowed Petitioner to explain what he meant:

---

[13] This explanation was consistent with prior comments trial counsel made in the
presence of the jury. Specifically, immediately after the prosecution asked Petitioner, on cross-
examination, to confirm that he "never said anything to [Detective Ellman] about [a] possible
intruder in the Losees' home," trial counsel interjected, "I don't think this gentleman ever said
there was an intruder in the Losees' home." (Tr. 3085.)

Q. At some point did [the police] ask you if you knew of any reason why [G.L] or [C.L.] would lie?

A. Yes, I was asked that question.

Q. What did you say?

A. I said absolutely not, I have no reason to believe that [C.L.] or [G.L.] would lie.

Q. And in doing so, saying that, were you admitting that what they said was true?

A. No. I just said that I didn't think they had any reason to lie.

(*Id.* at 2907.) Trial counsel therefore used his direct examination of Petitioner, rather than an objection or a curative instruction, to address specifically the negative inference that might be drawn from Petitioner's failure to deny the allegations by accusing the victims of being mistaken. Moreover, in the context of the prejudice inquiry, it is worth noting that although the prosecution referenced Petitioner's admission to the police that he did not believe the boys were liars, it did not argue that Petitioner's failure to tell the police that the victims were mistaken was evidence of his guilt. (*See* Tr. 3308.)

With regard to the three questions the prosecution asked Detective Ellman on direct and re-direct examination eliciting whether Petitioner "admit[ted] or den[ied] the allegations," (*id.* at 2533; *see also id.* at 2643 (asking whether Petitioner ever denied "touch[ing]" the victims)), trial counsel specifically addressed this issue multiple times during cross-examinations of the prosecution's witnesses and during his direct examination of Petitioner. First, in a lengthy exchange in his cross-examination of Detective Ellman, trial counsel directly questioned the witness about his statement that Petitioner did not "admit or deny the allegations":

Q. Anywhere in that story you just told us that [Petitioner] told you, does he admit sexual contact with the boys?

53

A. Not at that time.

Q. Well, I'm asking you a question, Detective, in that story did he admit sexual contact with the boys?

A. No, he did not.

Q. At any point does he admit any physical contact with the boys in the bedroom at all?

A. No, he does not.

. . . .

Q. There is no mention that he touched the boys at all at that point?

A. That is correct.

Q. To you, that is not admitting or denying it?

A. He admits that he was there, he is not admitting that he had sexual contact at that point.

. . . .

Q. So when he told you his rendition of what happened, he didn't make any admission as to the incident itself, did he?

A. Not to the incident itself, not to the sexual contact, no.

. . . .

Q. When you say not to the incident itself, what do you mean?

A. The incident, sir, as he explained it to me, he was there, he was in the Losee boys' bedroom. He did not say that he had sexual contact with them.

Q. So you considered that an admission?

A. An admission that he was there at the scene of the crime, yes.

. . . .

Q. During any portion of that half of the interview that you did observe, did [Petitioner] a[d]mit to sexual contact with the children in the room?

A. No.

Q. Did he admit to any sexual contact with the children at all?

A. No.

[Trial Counsel]:  Might I have a stipulation that during that entire interview there was no sexual contact admitted?

[Prosecution]:  That is correct, there was no admission.

(*Id.* at 2583–86, 2588.)

Second, in his cross-examination of Detective White, trial counsel asked questions which reinforced that Petitioner had denied the allegations:

Q. And a few minutes later Peter comes down and asks [Petitioner] to leave the house?

A. Yes, after confronting him with the allegation.

Q. Which, according to your notes, Petitioner denied?

A. Yes.

. . . .

Q. During those several times in the hour that you interviewed him, he was denying that he had any inappropriate contact with the boys, correct?

A. Yes.

Q. In fact, he told you that he had no contact with any child, and specifically not with [C.L.], in an appropriate manner, correct?

A. Yes.

. . . .

Q. How many times now have you heard [Petitioner's] version of the events?

A. Two or three times.  Three or four times, probably.

Q. During any of those renditions, did [Petitioner] ever say anything in the nature of an admission that he touched the children in a bad way?

A. That he touched the kids in a bad way, no.  He said he fell asleep in the room.

Q. But as far as the physical contact goes, did he say anything in the way of an admission, in the way of a physical contact?

A. No.

(*Id.* at 2740, 2765–66, 2768–69.)[14]

Third, in his direct examination of Petitioner, trial counsel asked Petitioner whether he ever denied the allegations to the police, and he specifically addressed the prosecution's question to Detective Ellman:

Q. And you told [Detective White] pretty much what you just told us?

A. Yes.

Q. Did you tell him that you denied the accusations to Peter?

A. I told him that I did not do any sexual things to any children that night.

. . . .

Q. . . . [W]hen you saw Detective Ellman, did you have any conversation with him?

A. Yes, I did.

Q. What was the substance of that conversation?

---

[14] Although these questions were sufficient to address any possible negative inference the jury may have drawn, to the extent they were not, by themselves, sufficient, the Court finds that trial counsel reasonably could have decided not to ask further questions given Detective White's testimony, on direct examination, that Petitioner denied the allegations. (*See* Tr. 2695 ("Q. Now, at this point did he admit to you that he had touched [G.L.] or [C.L.] in a sexual manner? A. No, he denied it.  He told me he had never touched [C.L.] or [G.L.] in a sexual manner on that day or ever, and he said he never touched any child in a sexual way.").)  Moreover, in another part of Detective White's testimony, when the prosecution asked him whether he "construe[d] [a statement from Petitioner] as an admission" and Detective White responded, "Yes, I did," trial counsel successfully moved to strike that statement. (*Id.* at 2709.)

A. Once again, it was reiterating exactly what I told Detective White and what I have told this jury.

Q. Detective Ellman testified to this jury that you didn't deny it and you didn't admit it to him at first; is that true?

A. I don't recall Detective Ellman's testimony.

Q. Did you deny it to Detective Ellman?

A. I most certainly did.

Q. Did you tell him the same thing that you told Detective White?

A. I told him exactly the same thing I told Detective White.

Q. Is that the same thing you told this jury just now?

A. It's the same thing I have been saying for the past 22 months.

(*Id.* at 2888, 2890–91.) Given trial counsel's comprehensive treatment of this issue throughout the trial, and given that the prosecution did not press the issue after Detective Ellman testified, the Court finds that trial counsel made a tactical decision not to object to or seek a curative instruction for the prosecution's questions to Detective Ellman, but instead pursued a strategy that effectively cured any possible negative inference. The Court therefore finds that the state court's conclusion that trial counsel was not deficient and that Petitioner did not suffer prejudice was not unreasonable.

With regard to the prosecution's cross-examination questions eliciting whether Petitioner told the police that he was "chewing tobacco throughout the course of the evening" or about the "plastic soda bottle," (*id.* at 2945, 3083–85), trial counsel directly addressed these questions in his re-direct examination of Petitioner:

Q. At the point in time on January 1 of 1999 when you were being interviewed by Detective White, did you have any idea what the significance of that bottle might be?

57

A. At that time I had absolutely no idea what they were going to do with it.

Q. How about when you talked with Detective Ellman later in the day?

A. The same answer applies, I had no idea.

Q. So when they asked you did you do these terrible acts to these children, you didn't think to tell them by the way, I was spitting into a soda bottle?

A. No, it was insignificant to me.

Q. When is the first time you became aware of the fact that allegedly your saliva was recovered on these penile/scrotum slides or samples from [C.L.]?

A. Sometime during the course of my incarceration, it must have been April, May or June of 1999.

Q. Was it at that point that you began to realize that the bottle might have some significance?

A. Yes.

Q. As you sat with the detectives on the 1st of January, you didn't think that bottle had any significance, did you?

A. No.

Q. And if you knew about that, you would have told them, wouldn't you?

A. Absolutely.

(*Id.* at 3114–15.) Trial counsel then reinforced Petitioner's testimony during his summation:

[The prosecution] is going to tell you there [are] all kinds of things that [Petitioner] didn't tell the cops. He didn't tell them about the spit bottle. What is he going to say?

If this were all a concoction on [Petitioner's] part, you better believe he would tell them about the spit bottle at that point. If [Petitioner] wanted to make an excuse at that point and if he said it wasn't me and I left the spit bottle in the front of the car, he would have told them about it. This was irrelevant to him.

At this point in the investigation there was only one person who thought this was important, and that was Peter Losee.

(*Id.* at 3211–12.)  The record therefore reflects that, consistent with his strategy throughout the trial, counsel again demonstrated to the jury, through the questioning of a witness and through comments in summation instead of through an objection or a curative instruction, that it cannot and should not infer Petitioner's guilt from his silence on an issue.

With regard to the cross-examination of Petitioner where the prosecutor twice asked whether his statement to police "indicate[d] how much [he] had to drink" at the party, (Tr. 2946, 2977), trial counsel reasonably might not have objected because he did not want to draw attention to the issue, which he ultimately argued in his summation was inconsequential to the case. (*See id.* at 3287 ("When you get down to it, does it really matter if the defendant was drunk at any point and, by the way, I submit to you that he wasn't. . . . So all this talk about intoxication, the bottom line is that it doesn't matter.").)  Moreover, to the extent Petitioner's silence on this issue implied evasiveness, any negative inference the jury might have drawn from Petitioner's silence in his statement to the police was both cured and outweighed by the prosecution's followup questions addressing what Petitioner affirmatively told the police, none of which Petitioner challenges in his Petition:

> Q.  In your signed statement where you indicated you had been drinking on the night of New Year's Eve, you do not indicate how much you had to drink, isn't that true?
>
> A.  I would have to look at the statement again to refresh my memory.  No, ma'am, it only says that I drank alcoholic beverages.
>
> Q.  In fact, you told Detective White that you had about 3 glasses of wine and maybe 3 or 4 vodka and tonics; do you recall saying that?
>
> A.  I think I told Detective White I had 3 or 4 glasses of wine and 3 or 4 vodka and tonics, yes.
>
> Q.  You also said the other times that you had more to drink than what you previously indicated, is that right?

59

A. I don't understand your question.

Q. Isn't it true to say that you also said you had between 8 and 10 glasses of wine that night?

A. That could be, yes.

Q. So was it 8 to 10 glasses of wine that you had that night, sir?

A. It was a mixture of wine and vodka and tonics. At the time it seemed inconsequential whether it was vodka and tonic or wine.

(*Id.* at 2977–78.) Finally, to the extent the questions involving Petitioner's silence hurt

Petitioner's credibility, Petitioner has not demonstrated why those questions, in the context of

the other unchallenged questions and of the entire trial, were, by themselves, so prejudicial that

the state court unreasonably denied his ineffective-assistance claim.

With regard to the prosecution's cross-examination of Petitioner's statement to the police

involving his reaction to Peter Losee upon being confronted with the allegations, trial counsel's

objection would have been overruled because the prosecution's question specifically challenged

Petitioner's statement on direct examination with a prior inconsistent statement:

> Q. You testified on direct examination that when Peter Losee confronted you and
> asked you why you were in the boys' room and then later told you about the
> allegations, that you said, and I believe you testified as follows: "Are you out of your
> fucking mind, Peter, are you still drunk?" Do you remember testifying to that this
> morning?
>
> A. Yes, I do.
>
> Q. Now, that is not what you told the police that letter [sic] Peter Losee said, is that
> right?
>
> A. I don't recall what I told the police with regard to that.
>
> Q. Isn't it true that you told the police that you said, "Peter, that's fucked up"?
>
> A. At one point I did say that to him, yes.

60

> Q. So you didn't say anything to the police about when Peter confronted you that Peter was drunk, did you?
>
> A. No, I did not.
>
> Q. In fact, the first time you said anything about Peter Losee being drunk was today on your direct examination, right?
>
> A. That is correct.

(*Id.* at 2964–65; *see also id.* at 2878 (direct examination of Petitioner, where he testified that he said, upon being confronted by Peter with the allegations, "'Peter, I think you're still drunk, you're out of your mind'").) The prosecution's questions were therefore not improper under *Doyle*, because as the Supreme Court clarified after *Doyle*, and as the New York Court of Appeals separately held, the Constitution does not prohibit the use of a defendant's post-*Miranda* silence to impeach a defendant. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) ("*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."); *People v. Savage*, 409 N.E.2d 858, 863 (N.Y. 1980) (holding, where a defendant makes post-*Miranda* statements to the police, that the defendant "should not [then] be permitted to forestall the impeachment of his credibility" with a subsequent inconsistent statement).[15] Moreover, even if

---

[15] Petitioner recognizes this exception to *Doyle*, but argues, broadly, that the prosecution's questions did not address prior inconsistent statements. (*See* Pet'r's Obj's 14–15.) But Petitioner's generalized argument, which rests on the dual assumptions that "there was no significant inconsistency between the Petitioner's initial statements and his trial testimony" and that "the questions focused on information which had never been sought from the Petitioner during his interrogation," (*id.* at 15–16), does not apply in the specific context of these questions, which directly addressed an inconsistency between Petitioner's trial testimony and his statements to the police regarding information that they specifically sought from him.

an objection might have been sustained, the objection was not so meritorious that trial counsel was required to raise it given that Petitioner's statement on direct examination was at least arguably inconsistent with his prior silence. Finally, whatever negative inference the jury might have *unfairly* drawn from the prosecution's question on this one issue was not so prejudicial that the Court can conclude that the state court unreasonably denied Petitioner's ineffective-assistance claim, because Peter Losee's sobriety was not a critical part of Petitioner's case, and Petitioner's arguable inconsistency on this issue was so unimportant to the prosecution's case that it did not raise it in its summation.

Lastly, with regard to the two remaining questions Petitioner identifies, both of which the prosecution asked during her direct examination of Detective Ellman, and both of which addressed whether Petitioner had "indicate[d] to [the police] anything about any problems or conflicts or issues" he had with the Losees and whether he told police "that the Losee family was setting him up," (Tr. 2571–72), Petitioner has again failed to demonstrate that the state court unreasonably denied his ineffective-assistance claim. Initially, the Court notes that these questions were arguably prejudicial in the context of trial counsel's summation argument that Peter Losee framed Petitioner, (*see id.* at 3178–83, 3222–24), and the prosecution's subsequent summation argument, which rebutted this defense in part by noting Petitioner's failure to mention this theory to the police:

> Do you think for one second, for one second if this defendant really felt that the Losees were doing him wrong, were betraying him, were setting him up for things he didn't do, he can't understand why he was confronted with these allegations, if you thought for one second the defendant thought maybe he [was] setting me up . . . do you think he wouldn't have told this to the police? You can't get this guy to stay quiet. You saw him on the witness stand, talkative, ingratiating, manipulative. He is not a wallflower, he is not somebody who is going to keep quiet. But he didn't

62

          say anything about this.  He didn't say that there are any problems with the Losees.
          He didn't say they were trying to set him up.

(*Id.* at 3262–63.)[16]  However, Petitioner's claim still fails because trial counsel's performance

was not deficient in relation to this issue, and Petitioner did not suffer prejudice.  First, the

prosecution's argument did not undermine Petitioner's credibility, because Petitioner had

consistently testified that he considered the Losees to be his friends, and that he therefore had

had no reason to believe that the Losees had set him up at the time he was interviewed.  (*See id.*

at 2827 ("Q. [Petitioner], what was the status of your relationship with the Losee family from the

Thanksgiving party up to and including New Year's Eve?  A.  It was a growing friendship, as it

had been throughout the entire school year."); *id.* at 2980–81 ("Q. At no time when you spoke

with Detective White or Detective Ellman, or any other police officer in conjunction with this

case, did you tell them that you had had any problems with Nancy or Peter Losee, correct?  A.

No, not at all.  Q.  Because you didn't have any problems with them, right?  A.  No, I had no

problems with Peter and Nancy Losee whatsoever.  Q.  In fact, at the time of this New Year's

Eve party, you testified earlier that you had a growing friendship with them, correct?  A.  Yes, it

was growing.  We had a wonderful relationship."); *id.* at 3010 ("Q.  And, in fact, when you left

the Losees' home after this Thanksgiving weekend event, you had no reason to think anything

was wrong between you, correct?  A.  No. . . .  Q.  And, in fact, nothing really changed in your

relationship with them between the time of Thanksgiving and New Year's Eve?  A.  No.  In fact,

I think it even grew better.").)  Second, trial counsel specifically preempted the prosecution's

summation argument regarding Petitioner's silence when, in the context of accusing Peter Losee

---

[16] The Court notes that Petitioner's claim relates only to the prosecution's questions
during the trial; he does not raise a claim that trial counsel was ineffective for failing to object to
the prosecution's summation.

of framing Petitioner, he explained to the jury why Petitioner did not mention this theory to the police. (*See id.* at 3211–12 ("[The prosecution] is going to tell you there [are] all kinds of things that [Petitioner] didn't tell the cops. He didn't tell them about the spit bottle. What is he going to say? If this were all a concoction on [Petitioner]'s part, you better believe he would tell them about the spit bottle at that point. If [Petitioner] wanted to make an excuse at that point and if he said it wasn't me and I left the spit bottle in the front of the car, he would have told them about it. This was irrelevant to him. At this point in the investigation there was only one person who thought this was important, and that was Peter Losee.").) Third, as the Court's analysis has previously demonstrated, trial counsel repeatedly made the point to the jury throughout the trial that they should not draw a negative inference from the fact that Petitioner did not make a statement on an issue to the police. (*See id.* at 2632–33, 3104–06 (intruder issue); *id.* at 2907 (mistake issue); *id.* at 2583–88, 2888, 2890–91 (admission issue); 3114–15 (spit-bottle issue).) Finally, to the extent these questions undermined Petitioner's defense, rather than his credibility, Petitioner suffered no prejudice because, in her summation, the prosecutor attacked this defense at length in ways Petitioner does not challenge, including by arguing that the defense was scientifically inconsistent with the DNA evidence, (*see id.* at 3239–49), and by arguing that Peter Losee had no motive to frame Petitioner and that Petitioner's argument was "ludicrous," (*see id.* at 3250–62). The Court therefore finds that the state court's denial of Petitioner's ineffective-assistance claim with respect to these questions was not unreasonable.

### f. Intoxication Instruction

Petitioner finally claims that trial counsel was ineffective for "fail[ing] to object" to a jury instruction on the effect of intoxication on intent, which the trial court gave initially at the prosecution's request, and then again after days of deliberation at the jury's request. (*See* Pet.

¶¶ 108–09.) Petitioner labels intoxication an "affirmative defense," and argues that "[t]his affirmative defense is designed solely for defendants who otherwise admit to the charged conduct, and seek only to negate the element of intent." (*Id.* ¶ 105.) Furthermore, because "[a] defendant invoking the affirmative defense of intoxication has a burden of proof," (*id.* ¶ 106), "th[e] instruction [improperly] placed a burden of proof on the defendant to establish facts" demonstrating his intoxication, (*id.* ¶ 108).

Petitioner argues that trial counsel's failure to object to the instruction was prejudicial for two reasons. First, because trial counsel "had . . . not presented evidence of intoxication at the time," and because Petitioner "had himself testified that he was *not* intoxicated at the time," "[t]he jury was . . . holding [Petitioner] to a burden of proof that he could not meet." (*Id.* ¶ 115 (emphasis in original).) Second, because Petitioner "had spent the entire trial asserting his actual innocence, . . . this instruction implied a concession that he had committed the acts," and because this was "a structural error that rendered the trial fundamentally unfair," trial counsel was ineffective for failing to "preserve[] a structural error," through an objection, that would have required "automatic reversal" on appeal. (*Id.* ¶¶ 117, 120.)[17]

The problems with Petitioner's final claim begin with the law and end with the record. First, in New York, intoxication is decidedly not an affirmative defense. Specifically, New York Penal Law provides that

---

[17] Petitioner also claims that "[t]he fact that the jury was weighing this affirmative defense, at the judge's instruction, was in and of itself a constitutional violation of Due Process." (Pet ¶ 112.) However, the Court does not and cannot consider a due process claim because Petitioner has not exhausted it, and Petitioner himself represents that his "sole claim for relief is that [he] was denied the effective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution." (*Id.* ¶ 96.)

> [i]ntoxication is not, as such, a defense to a criminal charge; but in any prosecution
> for an offense, evidence of intoxication of the defendant may be offered by the
> defendant whenever it is relevant to negative an element of the crime charged.

N.Y. Penal Law § 15.25 (emphasis added). Moreover, New York Penal Law also provides that

> (1) When a "defense," other than an "affirmative defense," *defined by statute* is
> raised at trial, the people have the burden of disproving such defense beyond a
> reasonable doubt.
>
> (2) When a defense *declared by statute to be an "affirmative defense"* is raised at
> trial, the defendant has the burden of establishing such defense by a preponderance
> of the evidence.

*Id.* § 25.00 (emphases added). Petitioner is thus incorrect that the intoxication defense "by its

nature shift[s] the burden of proof." (Pet. ¶ 8.) *See People v. Allen*, 503 N.Y.S.2d 143, 145

(App. Div. 1986) (rejecting a defendant's argument that an intoxication instruction "improperly

shifted the burden of proof" where "[t]he [j]udge instructed the jury that the People must prove

each and every element of the crimes charged, including intent, beyond a reasonable doubt, and

that evidence of intoxication may be considered in determining whether or not the defendant was

capable of forming the requisite intent"), *aff'd*, 508 N.E.2d 934 (N.Y. 1987).

Second, the intoxication instruction that the trial judge actually gave was an accurate

statement of New York Law, and it is worth excerpting it at length to demonstrate that the

instruction made clear that intoxication was not a defense and that Petitioner had no burden to

prove intoxication:

> Now let's look at intoxication. You heard during the trial testimony about alcohol
> and intoxication. Evidence has been presented upon this trial as to the
> defendant's state or non-state of intoxication at the time the crimes were allegedly
> committed. You should now become familiar with the law relating to the effect
> of intoxication upon criminal liability.
>
> Section 15.25 of the Penal Law of our state reads as follows: "Intoxication is not,
> as such, a defense to a criminal charge; but in any prosecution for an offense,
> evidence of intoxication of the defendant may be offered by the defendant

whenever it is relevant to negative an element of the crime charged." Now, what does this mean? This law means that intoxication, as such, is not a defense to a criminal charge. In other words, an intoxicated person is not relieved of criminal responsibility for his conduct merely because he was drunk when he committed a particular crime. But, this law does provide that evidence of intoxication may be considered by a jury in determining whether a defendant, in fact, possessed the requisite intent which is an essential element of many of the crimes charged in this indictment.

In order words, a jury may consider evidence of a defendant's intoxication in determining whether or not the mind of the defendant was so obscured by drink that he was not capable of forming the requisite criminal intent which the law makes an element of the crimes charged. In other words, it goes to the intent of the defendant in those crimes where a requisite intent is required.

Let me talk about that more. In this indictment or in this verdict sheet, the defense of intoxication appl[ies] to [certain counts] and it's not a defense, but it's a factor. The factor of intoxication goes to your consideration of the requisite intent required in . . . . these counts [that] charge the defendant with sex crimes by use of forcible compulsion which requires an intent.

. . . .

The intoxication defense does not apply to [the] counts . . . which charge sex crimes which are based on prohibited conduct by virtue of a child's age. Let me define that.

. . . .

If you find that the defendant engaged in deviate sexual intercourse with a child less than 11 years old . . . then by virtue basically of the fact that the child was less than 11 years old, the defendant must be held accountable no matter what his requisite intent.

. . . .

Again, with regard to intoxication, I repeat, intoxication is not a defense to a crime. That is because the law recognizes that quite often a defendant may be

intoxicated, yet at the same time be capable of forming a particular intent to commit a crime.

It is only where the intoxication is of such a degree, character and extent as to deprive defendant of the power to form the requisite and criminal intent to do the

crime, then he is relieved under the law of criminal responsibility of such
conduct.

(Tr. 3360–66 (emphases added).)

On the third day of deliberations, the jury asked to be reinstructed on intoxication, while

at the same time requesting reinstruction on the standards for forcible compulsion and reasonable

doubt. (*See id.* at 3503.) In complying with this request, the trial judge gave an instruction that

was consistent with the previously quoted instruction. (*See id.* at 3506–16.)

Initially, the Court notes that Petitioner tellingly does not quote from either of the actual

instructions, and he does not identify any legal error with the instruction itself. This significantly

undermines Petitioner's claim that trial counsel's failure to object to the instructions constituted

deficient performance. *See Aparicio*, 269 F.3d at 99 ("Generally, this Court has concluded that

counsel's failure to object to a jury instruction . . . constitutes unreasonably deficient

performance only when the trial court's instruction contained clear and previously identifiable

errors. Conversely, when a trial court's instruction is legally correct as given, the failure to

request an additional instruction does not constitute deficient performance."); *see also United

States v. Cohen*, 427 F.3d 164, 172 (2d Cir. 2005) ("Absent actual error in the [court's]

instruction, and in light of the overwhelming evidence presented at trial . . . , trial counsel's

failure to object to the jury charge did not constitute ineffective assistance of counsel."); *United

States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996) (finding "no compelling reason for [the attorney]

to object" to a charge that was "a standard recitation of the vicarious liability aspects of

conspiracy law").

Petitioner responds that, even if the instruction were legally correct, trial counsel should

have objected because the instruction by its nature was inconsistent with the defense strategy to

68

argue that Petitioner did not commit the crime, let alone his testimony that he was not

intoxicated that morning, (*see* Pet. ¶¶ 107–08, 115, 117), and because "a trial court 'is not

authorized to instruct the jury on legal principles that are not applicable to the particular case.'"

(*Id.* ¶ 104 (quoting *People v. DeGina*, 533 N.E.2d 1037 (N.Y. 1988).) But Petitioner is incorrect

that giving the intoxication instruction was improper in this case. First, for the principle that "it

is reversible error to instruct the jury on an affirmative defense which was not requested by

defense counsel," (Opp. at 5), Petitioner relies primarily on two New York Court of Appeals

opinions, *People v. DeGina*, 533 N.E.2d 1037 (N.Y. 1988), and *People v. Bradley*, 669 N.E.2d

815 (N.Y. 1996). In *DeGina*, the Court of Appeals found reversible error in a trial court's use of

an entrapment-defense instruction over defense objection. *See* 533 N.E.2d at 1041–42. And in

*Bradley*, the Court of Appeals made a similar ruling in the context of an insanity defense. *See*

669 N.E.2d at 816. But under New York Law, entrapment and insanity is each "an affirmative

defense," N.Y. Penal Law §§ 40.05, 40.15, whereas intoxication "is not . . . a defense,"

*id.* § 15.25. These cases, therefore, plainly do not stand for the principle that giving an

unrequested intoxication defense is reversible error.

     In his Objections to the R&R, Petitioner cites two Appellate Division cases which did

discuss an intoxication-defense instruction. In *People v. Williams*, 679 N.Y.S.2d 299 (App. Div.

1998), the court commented that "there was no reason for the [trial] court to give an

[intoxication] instruction *sua sponte*," and that "such action *might* have interfered with [the]

defendant's trial strategy." *Id.* at 299 (second emphasis added). However, the court still

unanimously affirmed the conviction. *Id.* Here, the instruction was given, not *sua sponte*, but

instead at the prosecution's request, (*see* Tr. 3054), and the *Williams* court's conclusion that it

"might have interfered" with the defense is hardly enough to establish that, in this case, the

instruction rendered "the result of the proceeding . . . fundamentally unfair or unreliable."
*Lockhart*, 506 U.S. at 369.

Moreover, in the other case cited by Petitioner, *People v. Cintron*, 428 N.Y.S.2d 267
(App. Div. 1980), the Appellate Division commented, in dicta, that "[i]f the [trial] court had
taken upon itself the obligation of explaining intoxication to the jury, serious questions may have
been raised about the denial of a fair trial by reason of an undue interference with the carefully
plotted strategy of the defense." *Id.* at 271. But this citation is inapposite in the context of an
ineffective-assistance claim, where it is precisely Petitioner's allegation that trial counsel's
strategy was not "carefully plotted." *Id.* In other words, at best, *Cintron* speaks to prejudice
resulting from trial court error, not from attorney error. And in any event, whether serious
questions "may . . . be[] raised" is not enough to demonstrate prejudice warranting habeas relief.
*Id.; see also United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996) (finding no *Strickland*
prejudice where "the absence of [the] instruction[] would not have affected the outcome of the
trial").

Second, the trial court's decision to give the intoxication instruction at the prosecution's
request was proper. Although Petitioner claims that "[n]ot only had he not presented evidence of
intoxication at the time, he had himself testified that he was *not* intoxicated at the time," (Pet.
¶ 115 (emphasis in original)), the record reveals that the intoxication issue may not have been so
clear to the jury. On direct examination, Petitioner testified that he "was becoming intoxicated"
and "was definitely feeling drunk" close to midnight. (Tr. 2860, 2863.) And although he
testified that he was not drunk when he woke up, (*see id.* at 2871), he also testified that he "was
hung over and [] had a headache," (*id.* at 2871), that he "was a little bit dizzy," (*id.* at 2873), that
he "[didn't] know how long" he was in the bathroom, (*id.* at 2873), and that he "was still dizzy"

70

after he left the bathroom and that "[s]omething was going on in [his] body and [he] just knew [he] had to lay down," (*id.* at 2874). Furthermore, on cross-examination, Petitioner testified that he "stumbled" on his way to the bathroom, (*id.* at 2971), that he had had "3 or 4 glasses of wine and 3 or 4 vodka and tonics" at the party, (Tr. 2977), and that he felt "disoriented" when he woke up, (*id.* at 3093).[18]

The Court is not persuaded by Petitioner's argument. Even though Petitioner may be correct that trial counsel carefully avoided raising an intoxication defense, there was sufficient evidence in the record for the trial judge to give the instruction (even if trial counsel had objected) given Petitioner's potential inability to form the requisite criminal intent from intoxication, and given the prosecution's right to prevent the jury from considering the issue on its own without a proper instruction. *See People v. Perry*, 462 N.E.2d 143, 143 (N.Y. 1984) ("A charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis."); *People v. Isrile*, 406 N.Y.S.2d 491, 491 (App Div. 1978) (noting that where "defendant had been drinking on and off all day," "even though defendant's counsel did not request an instruction on intoxication, such an instruction was required in the interest of justice"); *People v. Nater*, 392 N.Y.S.2d 303, 304 (App Div. 1977) (holding that where there was "sufficient evidence of intoxication in the record for a reasonable man to entertain a doubt as to the element of intent," "[d]espite there having been no request for an instruction as to intoxication, such an instruction was required in the interest of justice"); *see also United States v. Rahman*, 189 F.3d 88, 142 (2d

---

[18] Petitioner, of course, has a different view of this testimony, claiming that, "where [he] consumed, *at most*, ten drinks over the duration of a seven hour party, and consumed *no* alcohol in the five hours preceding the alleged assault, there is *no conceivable way* that he could have been intoxicated at the time of the offense." (Pet'r's Obj's 10–11 (third emphasis added).)

Cir. 1999) (holding that where defendant "did not assert cocaine intoxication as a defense" and opposed the instruction, the instruction was nonetheless "appropriate" because "[t]he instruction, the wording of which [was] not challenged, was needed to spear a red herring" (internal quotation marks omitted)).

Finally, even if the trial judge acted improperly, and even if trial counsel was deficient in not objecting, Petitioner still suffered no prejudice. Multiple times during the jury-instruction phase, both before and immediately after she gave the intoxication instruction, the trial judge stated the legally correct allocation of the burden of proof:

> The People have the burden of proving the defendant's guilt as to each and every fact and element essential to conviction. This burden never shifts. . . . [R]egardless of whether the defendant testifies or calls witnesses, the burden of proof never shifts. It is always on the People and the presumption of innocence remains with every defendant from the beginning of the trial until such time when, during final deliberations, the jury may be convinced that the People have proved the defendant's guilt beyond a reasonable doubt. Again, because the defendant has taken the stand, there is no shifting of the burden of proof. The burden of proof is always on the prosecution. Therefore, in your mind during your final deliberations, if you feel the People have not borne their burden of proof and the presumption of innocence has not been overcome by proof which convinces you beyond a reasonable doubt, then, of course, you must find the defendant not guilty. . . .

> . . . .

> [I]t is always incumbent upon the People to prove each and every essential element of the crime charged beyond a reasonable doubt and this burden of proof never shifts to the other side of the bench. It never shifts, even if the defense called no witnesses, . . . the burden of proof is always on the People.

> . . . .

> [T]he burden of proof is upon the People to establish to your satisfaction beyond a reasonable doubt that the defendant acted intentionally with respect to these particular crimes.

> . . . .

> As I have told you many times, the burden of proof is always on the prosecution to establish guilt beyond a reasonable doubt. There is never any obligation on the part of the defense to testify or to produce witnesses. . . . [T]he fact that the defendant has testified or produced witnesses does not in any way change or alter the burden of proof, which is always on the People and never on the defense. Even if you believe everything the defendant said, the burden of proof to prove the defendant's guilt by competent and credible evidence remains on the People.

(Tr. 3333–34, 3341–42, 3358–59, 3366–67.) Moreover, in response to the jury's request for re-

instruction, the trial judge again gave the intoxication instruction and again correctly allocated

the burden of proof:

> [O]n the charge of sodomy in the first degree, . . . the People have the burden of proof to establish that the defendant intended to forcibly compel another to engage in deviate sexual intercourse with him. If, by reason of the evidence of intoxication in this case from whatever source that evidence comes, the People have failed to establish to you that the defendant intended to forcibly compel another to engage in deviate sexual intercourse with him, then you must find the defendant not guilty of the crime of sodomy in the first degree.
>
> . . . .
>
> I instructed you that the People must prove to your satisfaction from all the evidence in this case beyond a reasonable doubt that the defendant had the intent or conscious objective to forcibly compel another to be subjected to sexual contact by him. If, therefore, in this case after considering all of the evidence bearing upon the defendant's intoxication you have a reasonable doubt whether the defendant was capable of forming the intent or conscious objective to forcibly compel another to be subjected to sexual contact by him, the defendant must be found not guilty of the crimes of sexual abuse in the first degree . . . . Now, obviously, if you find that the defendant was capable of forming the intent or conscious objective to forcibly compel another to commit any of the crimes I have listed so far, you would find the defendant guilty of these charges, given that the People have also proved to you the other elements of the crimes under those sections . . . .
>
> . . . .
>
> Therefore, . . . after considering all the evidence bearing upon the defendant's alleged intoxication, if you have a reasonable doubt whether the defendant was capable of knowingly acting in a manner likely to be injurious to the physical, mental or moral welfare of a child, the defendant must be found not guilty of endangering the welfare of a child . . . .

73

(*Id.* at 3511–15.) Because these instructions repeatedly explained the correct burden of proof, trial counsel was not deficient for failing to object, and his failure to object was not prejudicial to Petitioner. *See Aparicio*, 269 F.3d at 100 ("[T]he trial judge repeatedly instructed the jury that they had to conclude beyond a reasonable doubt that the defendant was the perpetrator of every element of an offense before they could convict. Thus, the charge sufficed as an accurate statement of the law. Because, under the circumstances, the jury instructions were not improper, the failure of Petition's trial counsel to object . . . was not objectively unreasonable." (citations and internal quotation marks omitted)); *Tsirizotakis v. LeFevre*, 736 F.2d 57, 63–64 (2d Cir. 1984) ("[E]ven if the failure to object was error, we cannot conclude in all of the circumstances of the case that there was any reasonable probability that, absent the challenged intent language, the outcome of the case would have been different. There was a plethora of evidence that petitioner admitted having [committed the crime]. In addition, the trial court's charge to the jury stated several times that the prosecution bore the burden of proving petitioner's guilt beyond a reasonable doubt . . . . Thus, viewing the charge as a whole, and in the context of all the evidence presented at trial, we see no likelihood that counsel's failure to object to the court's intent language constituted prejudice to petitioner sufficient to satisfy the requirements of [*Strickland*]."). Therefore, the Court rejects Plaintiff's claim of ineffective assistance for the failure to object to the intoxication instruction.

### C. Certificate of Appealability

Under AEDPA, "an appeal may not be taken to the court of appeals" "[u]nless a circuit justice or judge issues a certificate of appealability [("COA")]." 28 U.S.C. § 2253(c)(1). A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). Where, as here, a district court rejects a petition on the

74

merits, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Although the Court is confident in the correctness of its ruling, it also finds that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner" with regard to the post-*Miranda* silence issue. *Id.* at 336 (internal quotation marks omitted). And it finds, relatedly, that that issue is "adequate to deserve encouragement to proceed further." *Id.* (internal quotation marks omitted). The Court thus grants a COA on the specific issue of whether Petitioner's right to the effective assistance of trial counsel was violated when trial counsel did not object to the prosecution's questions that arguably implicated Petitioner's right to remain silent. *See Blackman v. Ercole*, 661 F.3d 161, 163–64 (2d Cir. 2011) ("In granting a COA, a district judge is required to indicate the 'specific issue or issues' that satisfy [the § 2253(c)(3) standard] . . . ." (quoting 28 U.S.C. § 2253(c)(3))).

### III. Conclusion

Based on the foregoing analysis, the Court denies the Petition. It finds that the state courts' decisions denying Petitioner's ineffective-assistance-of-counsel claims were not an "unreasonable application" of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, it is

ORDERED that the Report and Recommendation dated March 30, 2011, is ADOPTED to the extent it recommends dismissal of the Petition. It is further

ORDERED that Petitioner's writ of habeas corpus is DISMISSED with prejudice. It is further

ORDERED that a Certificate of Appealability shall be issued, and that, pursuant to 28

U.S.C. § 1915(a)(3), an appeal from this judgment on the merits would be taken in good faith

only as to the issue regarding post-*Miranda* silence.

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent

and to close this case.

SO ORDERED.

Dated:            October 27, 2014
                  White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE